05-4985-cv
Tractebel v. AEP Power

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

––––––––––

August Term, 2006

(Argued: December 14, 2006                    Decided: May 22, 2007)

Docket Nos. 05-4985-cv(L), 05-5136-cv(XAP)

––––––––––

TRACTEBEL ENERGY MARKETING, INC., now known as
SUEZ ENERGY MARKETING NA, INC. {"TEMI"}, and TRACTEBEL, S.A.,
now known as SUEZ-TRACTEBEL S.A. {"TSA"},

*Plaintiffs-Counter-Defendants-*
*Appellants-Cross-Appellees*,

–v.–

AEP POWER MARKETING, INC., AMERICAN ELECTRIC POWER COMPANY, INC.
and OHIO POWER COMPANY,

*Defendants-Counterclaimants-*
*Appellees-Cross-Appellants.*

––––––––––

Before:

SACK, SOTOMAYOR, WESLEY, *Circuit Judges.*

Appeal and cross-appeal from an August 12, 2005 judgment, and March 23, 2006 amended judgment, of the United States District Court for the Southern District of New York (Baer, *J.*) awarding damages for breach of contract but denying damages for repudiation of contract. Affirmed in part, vacated in part, and remanded to the district court for further proceedings consistent with this opinion.

––––––––––

MICHAEL LESCH, LeBoeuf, Lamb, Greene & MacRae LLP, New York, NY

(Theodore J. Fischkin, Randall M. Fox, Stephanie A. Wilkins, *on brief*) for Plaintiffs-Counter-Defendants-Appellants-Cross-Appellees.

STEVEN C. BENNETT, Jones Day, New York, NY (Bonnie L. Hemenway, Todd S. Swatsler, Robert W. Hamilton, Michael R. Gladman, *on brief*), *for Defendants-Counterclaimants-Appellees-Cross-Appellants*.

—————

WESLEY, *Circuit Judge*:

Tractebel Energy Marketing, Inc. ("TEMI") and AEP Power Marketing, Inc. ("AEP") filed opposing complaints in the District Court for the Southern District of New York, each alleging the other side breached a long-term energy contract entered into by the parties on November 15, 2000. TEMI appeals a January 21, 2005 order of the district court (Baer, *J.*) granting summary judgment for AEP on that count of TEMI's complaint asserting that the contract was unenforceable. TEMI further appeals the district court's August 12, 2005 judgment awarding AEP $122,992,857, plus prejudgment interest, for TEMI's breach of certain provisions in the contract. AEP cross-appeals the district court's denial of damages caused by TEMI's ultimate repudiation of the contract. We affirm in part, vacate in part, and remand for further proceedings.

## BACKGROUND

This dispute arises from a contract for the supply of energy products over a twenty-year period. The record is voluminous and complex. Fortunately, the facts have been succinctly, yet comprehensively, set forth by the district court in *Tractebel Energy Marketing v. AEP Power Marketing*, Nos. 03-6731, 03-6770, 2005 WL 1863853, 2005 U.S. Dist. LEXIS 15972 (S.D.N.Y. Aug. 8, 2005). We therefore provide only a brief overview of the factual background here,

supplementing that background in later sections of the opinion as it becomes relevant.

In 2001, AEP and Dow Chemical Company ("Dow") agreed to develop a gas-fired cogeneration facility ("Facility") at the Dow complex in Plaquemine, Louisiana. "Cogeneration" means that the same turbine generating units that produce electricity also produce steam used in Dow's manufacturing processes. AEP agreed to operate the Facility and committed to purchasing the electricity produced.

The amount of energy AEP committed to take from the Facility was immense, and, accordingly, prior to entering the agreement with Dow AEP sought a guaranteed buyer. On November 15, 2000, AEP and TEMI entered into the contract at issue – the Power Purchase and Sale Agreement ("PPSA"). AEP promised to supply energy products to TEMI from the Facility and, in return, TEMI promised to take a minimum amount of those products and make associated payments at prices stipulated in the contract. The collapse of the energy market in 2001-02 significantly diminished the value of the PPSA to TEMI, and TEMI began examining strategies to free itself of its PPSA obligations. When negotiations with AEP proved unavailing, TEMI began preparing for litigation.

The PPSA set a target commercial operation date ("target COD") of May 1, 2003. Construction at the Facility was delayed and actual commercial operation ("actual COD") did not occur until April 2, 2004. As of target COD, and continuing until actual COD, AEP billed TEMI for replacement energy products pursuant to a provision in the PPSA that, in AEP's view, required TEMI to purchase a minimum amount of energy, from the Facility or external sources. Having no need for replacement energy given the state of the energy market, and disputing its obligation to take energy from external sources, TEMI rejected the products offered by AEP.

Ultimately, TEMI repudiated the contract and the parties sought judicial resolution of their dispute.

On September 5, 2003, the parties filed complaints against each other in the district court. AEP alleged that TEMI first breached the PPSA by not paying for replacement products, and then repudiated the contract altogether. AEP sought damages for replacement products and for the profits it expected to make had the contract been performed. TEMI claimed that it was under no obligation to pay for replacement products or to compensate AEP for repudiating the contract because the contract was unenforceable. TEMI argued the PPSA was unenforceable for three reasons: (1) the parties were unable to agree to an operations protocol that was expressly contemplated by the PPSA; (2) AEP violated the covenant of good faith and fair dealing; and (3) AEP did not use "reasonable efforts" to obtain Qualified Facility ("QF") certification from the Federal Energy Regulatory Commission ("FERC"), as required by the PPSA. TEMI further argued that, even if the PPSA were enforceable, TEMI was under no obligation to take and pay for replacement energy and capacity prior to actual COD. TEMI also made a motion for a primary-jurisdiction referral to FERC to determine the validity of the Facility's QF certification.

After a hearing, the district court, in an order entered November 3, 2004, denied TEMI's motion for a primary-jurisdiction referral. Although the court did not explain its reasoning in the order, it suggested during the hearing that the only issue before it was whether AEP had exerted "reasonable efforts" to obtain QF status, a matter it was competent to decide without input from FERC. On September 22, 2004, AEP made a motion for summary judgment with respect to Count I of TEMI's complaint – that the PPSA was nothing more than an unenforceable agreement to agree – and, on January 21, 2005, the district court granted the motion. The district

court held that the PPSA was an enforceable contract, despite the failure to reach agreement on the protocol. Subsequently, the district court conducted a bench trial in March and April 2005. During the trial, the court granted judgment for AEP pursuant to Federal Rule of Civil Procedure 52(c) on the QF status issue. It concluded that AEP had exerted reasonable efforts to obtain and maintain QF status because it had successfully obtained this status and had not used fraudulent means to do so. At the close of trial, the court rejected TEMI's remaining contentions, finding that AEP did not act in bad faith at any point during its relationship with TEMI. The court held, therefore, that TEMI was not free from obligation under the PPSA. The district court awarded AEP damages for replacement products, but declined to award AEP further damages for lost profits incurred as a result of TEMI's repudiation of the contract, reasoning that such profits were not determinable with a sufficient degree of certainty.

On appeal, TEMI asserts that the district court erred in finding that (1) the PPSA was enforceable, (2) AEP did not breach the covenant of good faith and fair dealing, (3) AEP used reasonable efforts to obtain QF certification, and (4) TEMI was liable for replacement products in the pre-COD period. In its cross-appeal, AEP claims it is entitled to damages for TEMI's repudiation of the PPSA. For the reasons stated below, we affirm in part, vacate in part, and remand to the district court.

## DISCUSSION

### I. Whether the PPSA is Enforceable

Section 9.1 of the PPSA directs the parties to enter into a "mutually agreeable" Dispatch/Operations Coordination Protocol ("Protocol") that "set[s] forth the detailed requirements for notice, forecast, scheduling, dispatch, operation, maintenance, maintenance

coordination, approvals and other matters related to the operations and maintenance (including outages) of the Project and the sale and delivery of the Products to Buyer." PPSA § 9.1. Count I of TEMI's complaint sought declaration that the PPSA was unenforceable because the parties never agreed to a Protocol. Compl. ¶ 24. TEMI argues that the essential purpose of the PPSA – the sale and delivery of energy products to TEMI – could not be accomplished without agreement on the logistical details the Protocol was to address. In TEMI's view, the details reserved for the Protocol were material terms. In the absence of agreement on these terms, TEMI argues, the PPSA was merely an unenforceable "preliminary agreement."

The district court found that the PPSA was "comprehensive" and "incorporate[d] all material terms of the 20-year power purchase agreement." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, Nos. 03-6731, 03-6770, 2005 WL 146807, at *4, 2005 U.S. Dist. LEXIS 869, at *12 (S.D.N.Y. Jan. 21, 2005). "It contains no less than 165 defined terms, clearly specified products, delivery, prices, payment, credit guaranties, as well as terms relating to the operations and maintenance of the facility. Perhaps more importantly, the PPSA sets out both conditions precedent and subsequent and termination rights – none of which mention[s] the failure to agree upon a Protocol." *Id.* The district court also noted that in three separate locations the PPSA indicates that it is a binding agreement.[1] *Id.* at *5, 2005 U.S. Dist. LEXIS 869, at *13. Upon AEP's motion, the district court granted summary judgment on Count I of TEMI's complaint.

Summary judgment is appropriate where there is no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Beth*

[1] Section 16.2.4 states that the PPSA "constitutes a legally valid and binding obligation"; section 16.8 states that the PPSA "constitutes the entire agreement between the Parties" and is "binding"; and section 16.15 states that the PPSA is a "legal binding instrument."

*Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 579 (2d Cir. 2006). We review a grant of summary judgment de novo. *Id.* On the question of whether the PPSA is enforceable, neither party claims that there exists a genuine issue of material fact. TEMI argues that summary judgment was inappropriate, not because factual issues remain, but because the "fully developed" record establishes that the PPSA is no more than a preliminary agreement to agree and is therefore not enforceable against TEMI. TEMI Br. at 44. Thus, TEMI argues summary judgment was appropriate, but should have been granted in *its* favor, rather than AEP's. In evaluating the appropriateness of summary judgment in favor of AEP, therefore, the question is whether the record establishes that the PPSA is enforceable.

"To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."[2] *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999) (citation omitted). There must be "an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.* "[A] mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981) (citation omitted). However, "not all terms of a contract need be fixed with absolute certainty." *Express Indus.*, 93 N.Y.2d at 589. "[A] contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement." *May Metro. Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 264 (1943). "[A]t some point virtually every agreement can be said to have a degree of indefiniteness," but

---

[2] PPSA § 16.6 provides, "This Agreement and the rights and duties of the parties hereunder shall be governed by and construed, enforced and performed in accordance with the laws of the State of New York . . . ."

"parties . . . should be held to their promises." *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989).

We agree with the district court that both parties intended the PPSA to be legally binding, and that the PPSA contained all material terms. The language of the PPSA gives every indication that the parties intended it to be binding. For example, section 16.2.4 states that the PPSA "constitutes a legally valid and binding obligation"; section 16.8 states that the PPSA "constitutes the entire agreement between the Parties" and is "binding"; and section 16.15 states that the PPSA is a "legal binding instrument." "[A] party that does not wish to be bound . . . can very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.'" *Teachers Ins. & Annuity Ass'n. of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987) (Leval, *J.*).

A party may also condition the enforceability of an agreement on the occurrence of one or more stipulated events, as the parties did here. Section 11.2 of the PPSA lays out a number of conditions precedent that were to be satisfied before AEP was obligated to sell any products to TEMI. But the PPSA did not identify successful completion of Protocol negotiations as a condition of the PPSA's enforceability. As the district court stated, "It stretches credulity . . . to conclude . . . that if the Protocol were the deal-breaker TEMI claims it to be, that it was omitted amongst the detailed recitals and provisions of the PPSA or listed as one of the many conditions precedent."[3] *Tractebel*, 2005 WL 146807, at *4, 2005 U.S. Dist. LEXIS 869, at *12-13.

---

[3] TEMI argues that section 9.1 established that the PPSA was not enforceable prior to the successful completion of Protocol negotiations. Section 9.1, however, merely states that the parties "will enter into a mutually agreeable [Protocol], not later than June 1, 2001"; it does not state that the parties are free from further obligation under the PPSA should the Protocol negotiations fail. As the district court noted, if a contract is conditioned on the occurrence of a

The PPSA covered all material terms.  Section 9.1 contemplates future negotiation of the "detailed requirements" of the following terms: "notice, forecast, scheduling, dispatch, operation, maintenance, maintenance coordination, approvals and other matters related to the operations and maintenance (including outages) of the Project and the sale and delivery of the Products to Buyer."  Without *any* agreement on these terms, the PPSA might be unenforceable.  However, the PPSA addresses each of them.  With respect to "notice" and "forecast," sections 9.4, 9.5 and 9.6 delineate the parties' respective responsibilities regarding Forecasted Availability Notice, Forecasted Delivery Notice and Delivery Notice.  These sections merely leave the "form" of notice to be addressed by the Protocol.  Section 9.9 sets forth the parties' respective responsibilities with regard to "scheduling."  Section 9.3 sets forth TEMI's exclusive right to "dispatch" products.  Section 10.1 sets forth AEP's responsibility to "operate" and "maintain" the Facility.  Finally, section 10.2 provides fairly detailed requirements pertaining to "maintenance (including outages)."  For each term listed in section 9.1, the parties' respective obligations are identified elsewhere in the PPSA.  Thus, all material terms are covered by the PPSA; only certain non-material details were left to future negotiations.

The law of New York is clear that a contract will not fail for indefiniteness unless the matters left open are material.  *May Metro. Corp.*, 290 N.Y. at 264.  As the details left to be worked out in the Protocol are not material, and since TEMI has not suggested that any other material terms are missing, the PPSA is enforceable.

---

particular event (such as successful negotiation of a Protocol), "[t]he language of the condition must be explicit." *Tractebel*, 2005 WL 146807, at *4, 2005 U.S. Dist. LEXIS 869, at *13 (quoting *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 154 F. Supp. 2d 696, 704 (S.D.N.Y. 2001) (alteration in original)).

Although we conclude that the PPSA is enforceable on its face, TEMI's conduct in the years after the PPSA was entered into bolsters this conclusion. "[E]ven where parties explicitly designate a material term 'to be mutually agreed upon' in the future . . . courts may still find the presence of a binding agreement where 'the parties intend to enter into a binding contractual relationship.'" *H/R Stone, Inc. v. Phoenix Bus. Sys., Inc.*, 660 F. Supp. 351, 356 (S.D.N.Y. 1987) (Walker, J.) (quoting *Allen & Co. v. Occidental Petroleum Corp.*, 382 F. Supp. 1052, 1057 (S.D.N.Y. 1974), *aff'd*, 519 F.2d 788 (2d Cir. 1975) (internal quotation marks omitted)). "[T]he existence of a contract may be established through the conduct of the parties recognizing the contract." *Apex Oil Co. v. Vanguard Oil & Serv. Co.*, 760 F.2d 417, 422 (2d Cir. 1985). "In determining whether the parties' conduct is consistent with the existence of a binding contract, it is necessary that the totality of all acts of the parties, their relationship and their objectives be considered." *H/R Stone*, 660 F. Supp. at 356 (internal quotation marks, citation and brackets omitted). Upon review of TEMI's conduct in the years after it signed the PPSA, it is clear that TEMI understood the PPSA to be binding and enforceable.

For example, on June 3, 2002, TEMI wrote to AEP noting that the expected operations date for the Plaquemine facility was October 13, 2003, "some five months later than the target date of May 1, 2003." TEMI reminded AEP that under the PPSA it was "required to provide replacement power to [TEMI] beginning May 1, 2003," if the Plaquemine facility was not up and running by that date. TEMI's present claim that the PPSA is unenforceable does not square with the assertion of its right to Replacement Products under the PPSA in 2003.

On May 7, 2003, TEMI's Robert Stibolt sent a letter to AEP's Frank Hilton in response to the latter's request for a increase in the credit guaranty pursuant to PPSA § 7.1.2. Stibolt's letter

takes issue only with AEP's calculations under section 7.1.2; it makes no claim that section 7.1.2 is unenforceable. If TEMI did not view the PPSA as a binding commitment, it surely would have disputed the *fact* of liability under section 7.1.2, not just the *extent* of liability.

In a June 10, 2003 letter, TEMI's Sam Henry requested certain information from AEP's Brian Tierney. Henry writes, "As Buyer, *TEMI has express contract rights pursuant to [PPSA] sections 3.6 and 3.7*, which will be *breached* if [AEP] cannot assure [TEMI] all deficiencies will be promptly cured." (emphasis added). It would seem disingenuous for TEMI to now claim that the PPSA is unenforceable when previously TEMI asserted its "rights" under the contract.

Finally, in early 2003, more than a year and a half after the June 1, 2001 Protocol deadline, the parties signed a letter agreement amending the PPSA which stated "[e]xcept to the extent expressly modified by this letter agreement, all other terms and conditions of the [PPSA] *shall remain unmodified and continue in full force and effect*." (emphasis added). TEMI argues that this language merely reaffirmed the parties' obligation to negotiate the Protocol in good faith. The letter agreement, however, states that "*all* other terms and conditions" of the PPSA shall "continue in full force and effect," not just section 9.1's mandate to negotiate a Protocol. The letter agreement indicates that TEMI understood the terms of the PPSA to have "force and effect."

An agreement for a 20-year project like the one at issue here will inevitably be elaborate, extensive and complex. No matter how much time and effort the parties expend working out the details in advance, however, some of the practical details will require refinement as the project begins to take shape. The fact that the contract anticipates that the parties will have to negotiate these details in the future does not render the contract unenforceable. *See May Metro. Corp.*, 290

N.Y. at 264. Where, as here, the parties have agreed on all material terms of the contract and clearly manifested their intent to be bound by those terms, but have left the practical implementation of certain terms to be resolved in good faith negotiations at a future date, the contract will be enforced.[4]

## II. Whether AEP Acted in Good Faith

Under New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance. *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). The covenant "embraces a pledge that neither party shall do anything which will have

---

[4] TEMI makes much of the preliminary agreement dichotomy explained in a decision by then-District Judge Leval. In *Teachers Insurance and Annuity Association of America v. Tribune Company*, Judge Leval carefully identified two types of preliminary agreements that exist under New York law. 670 F. Supp. at 498; *see also Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 547-48 (2d Cir. 1998) (applying the *Tribune* preliminary agreement framework); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71-72 (2d Cir. 1989) (same). The first type of preliminary agreement ("Type I") exists "when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation," although they may "desire a more elaborate formalization of the agreement." *Tribune*, 670 F. Supp. at 498. A Type I agreement is enforceable. *Id.* The second type of preliminary agreement ("Type II") "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith." *Id.* TEMI insists that the PPSA was of the second order, and, because TEMI negotiated in good faith and was unable to reach agreement with AEP on the details of the Protocol, TEMI was never bound by the PPSA. TEMI argues that the district court erred in concluding that the PPSA was an enforceable Type I agreement.

In distinguishing between Type I and Type II preliminary agreements, TEMI misframes the issue. Although the district court discussed the Type I / Type II preliminary agreement dichotomy, ultimately the court concluded that the PPSA was not a preliminary agreement at all: "I, however, cannot conclude that the PPSA was merely a 'preliminary commitment' that TEMI can abandon . . . . The PPSA is comprehensive and incorporates all material terms of the 20-year power purchase agreement." *Tractebel*, 2005 WL 146807, at *4, 2005 U.S. Dist. LEXIS 869, at *12. As explained above, we agree with the district court that the PPSA was not merely a preliminary agreement but an enforceable contract. The preliminary agreement dichotomy is inapposite.

the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (internal quotation marks and citation omitted). In some cases, the covenant may even require "affirmative steps to cooperate in achieving" the contract's objective. FARNSWORTH ON CONTRACTS § 7.17 (2d ed. 2001). "[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." 23 WILLISTON ON CONTRACTS § 63:22 (4th ed. 2006).

"In determining whether a party has breached the obligation or covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." *Id.* "Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." *Id.* (citations omitted); *see also Kobrin v. Univ. of Minnesota*, 121 F.3d 408, 415 (8th Cir. 1997); *McMahon Food Corp. v. Burger Dairy Co.*, 103 F.3d 1307, 1313 (7th Cir. 1996). We may not set aside the district judge's findings of fact during a bench trial unless they are clearly erroneous. Fed. R. Civ. P. 52(a); *see also Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985).

TEMI relies on two instances to show that AEP violated the covenant of good faith and fair dealing. The first occurred during Protocol negotiations when AEP submitted its proposed changes to TEMI's January 2003 Protocol draft. The second occurred when AEP sought a credit guaranty increase pursuant to PPSA § 7.1.2 which TEMI claims was based on "planted quotations." We agree with the district court that neither instance demonstrates a breach of the

covenant of good faith and fair dealing on the part of AEP.

*A. The Protocol Negotiations*

Although PPSA § 9.1 states that the parties were to enter into a mutually agreeable Protocol no later than June 1, 2001, Protocol negotiations did not begin until May 29, 2002. *Tractebel*, 2005 WL 1863853, at *3, 2005 U.S. Dist. LEXIS 15972, at *10. On that date the parties agreed to exchange Protocol outlines within four weeks. *Id.* AEP produced nothing by the deadline; TEMI sent only a two-and-a-half page rough draft outline that the district court found to be "far from a final Protocol." *Id.* Both parties agreed that the Protocol negotiations would be a back-and-forth process over several months. *Id.*, 2005 U.S. Dist. LEXIS 15972, at *10-11. The following months witnessed a significant amount of foot-dragging by the parties; neither seemed distressed that the deadline for negotiating the Protocol had long since passed. *See id.*, 2005 U.S. Dist. LEXIS 15972, at *11.

Although the parties exchanged numerous drafts during the course of negotiations, TEMI argues that AEP's April 2003 draft was a blatant attempt to frustrate the Protocol negotiations, which amounted to bad faith. TEMI identifies four aspects of AEP's April draft in support of that conclusion.

First, although PPSA § 3.3.4.1 required the Steam Peaking Product ("SPP")[5] to be available on ten-minutes-notice, AEP's April draft provided that the SPP would only be available on thirty-minutes-notice before the top of the hour, which could mean up to eighty-nine minutes. TEMI agues that the short notice period was important because it made the SPP highly valuable

---

[5] The SPP is "an amount of Capacity equal to the Capacity of [one of the Plaquemine units] . . . and its associated Energy and Ancillary Services." PPSA § 1.149.

to customers requiring immediate delivery of additional power. AEP counters that the notice provisions were based on Entergy's[6] scheduling requirements, and that TEMI's June 2002 draft Protocol made direct reference to the need "to conform to Entergy's scheduling protocols." AEP's Joel Jansen testified that Entergy rules require, "in the normal course," that power be properly identified and scheduled ("tagged") before it may be placed on the Entergy power grid for delivery to an end user. The district court found that this explanation for modifying SPP availability was "based on reasonable concerns." *Tractebel*, 2005 WL 1863853, at *8, 2005 U.S. Dist. LEXIS 15972, at *27.

On appeal, TEMI claims that the district court "ignored undisputed evidence that AEP's excuse rested on a false premise: that tagging was required 'in the normal course.'" TEMI Br. at 47. TEMI argues that Entergy rules requiring that power be identified and scheduled, which necessitates a longer notice period, did not apply to the power AEP would deliver to TEMI, and, thus, did not compel AEP to ask for more than ten minutes' notice. The record suggests, however, that as a general matter power *was* required to be tagged, requiring notice periods in excess of ten minutes. When AEP submitted the April draft suggesting a longer notice period in order to accord with Entergy requirements,[7] the Entergy Open Access Transmission Tariff required that energy be identified twenty minutes before the top of the hour for scheduling. Entergy Open Access Transmission Tariff § 13.8. While an AEP executive at trial alluded to the

---

[6] Entergy is a large utility located in the southern United States. It is the transmission service provider in the area where the Plaquemine Facility is located. The Plaquemine Facility is connected with the Entergy grid.

[7] The PPSA directly references the need for the Protocol to accord with Entergy scheduling requirements. *See* PPSA §§ 9.3, 9.6, 9.8, 9.9.

possibility that in certain situations power could still be provided on ten minutes' notice, TEMI offers no evidence that the Entergy tagging requirements did not apply "in the normal course."

Second, TEMI argues that while section 9.7 required AEP to make operating data available on a "real-time" basis, AEP's April draft provided that AEP would communicate operating data on a "daily basis." TEMI argues that real-time communication was essential and that anything less would have "rendered the Products of little economic value, injured TEMI's relations with its customers, and subjected TEMI to large Entergy tariff penalties."[8] TEMI mischaracterizes AEP's April draft. PPSA § 9.7 states that "[r]eal-time electronic operating data (including *generating dispatch* and *outage information*) shall be available to Buyer and Seller for the Project." (emphasis added). Section 1.2 of the April draft states that "[a]ll operating data, including but not limited to operating limits, ramp-rates, previous day's actuals, previous day's gas turbine starts, amount of each product available, and the status of steam turbine, will be conveyed *daily* from Seller to Buyer," (emphasis added) but section 1.3 of the April draft ("real-time information") provides, "[r]eal-time information, including but not limited to *generating dispatch* and *outage information*, will be conveyed to the Buyer from the Seller via telemetering,

_____

[8] On this point TEMI also argues that the district court committed legal error because it justified the way in which the April draft dealt with real-time information "primarily on the ground that there was 'no evidence' AEP sought 'to delay execution of the Protocol.'" TEMI Br. at 48 (citation omitted). TEMI argues that the district court's reasoning is "legally untenable, since motive is irrelevant to whether there has been a breach of contract." *Id.* (citing *Koufakis v. Carvel*, 425 F.2d 892, 906 (2d Cir. 1970)). TEMI cites the law correctly but misidentifies the issue. The question here is not whether AEP breached the express terms of the contract, but whether AEP acted in good faith; that is an issue entirely tied to motive. *See Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (finding under New York law, that Airline breached implied covenant of good faith and fair dealing when its promotional efforts were not based on good faith business judgments but, rather, "improper motive"); *Polotti v. Flemming*, 277 F.2d 864, 868 (2d Cir. 1960) (Under New York law, "'good faith' connotes an actual state of mind – a state of mind motivated by proper motive.").

with back-up via email and telephone." (emphasis added). Thus, Section 1.3 of the April draft accords perfectly with PPSA § 9.7, which requires that generating dispatch and outage information be conveyed on a real-time basis.

Third, TEMI claims that AEP's April draft removed from TEMI's January draft certain details pertaining to operations which, in their absence, rendered AEP's draft "useless." On this point TEMI provides little explanation and almost no evidence that the removed details were fundamental to an operative Protocol. TEMI cites only to AEP's April draft and to conclusory statements contained in an affidavit by a TEMI executive. This evidence does not establish bad faith.

Finally, TEMI argues that AEP's draft removed earlier references to replacement products and substituted "one vague and inadequate" paragraph, thereby depriving TEMI of a useful Protocol for replacement products. TEMI offers no explanation as to why the section of AEP's draft addressing replacement products was inadequate. In any event, "inadequacy" is something that TEMI could have taken up with AEP in further negotiations; it is not evidence of bad faith.

In sum, TEMI's evidence that AEP acted in bad faith during the Protocol negotiations fell far short of its burden. Moreover, as the district court stated, "[n]o one at AEP ever represented that [the April draft] was a 'take it or leave it' proposition, and there was always the possibility of further discussions." *Tractebel*, 2005 WL 1863853, at *8, 2005 U.S. Dist. LEXIS 15972, at *28. TEMI argues that the district court erred because "[b]y definition, a counteroffer rejects and terminates the offer, so that the offer cannot thereafter be accepted so as to create a contract." Labeling the various drafts "offers" and "counteroffers" is pointless. The parties were in *negotiations* that were specifically contemplated by the PPSA. By definition, negotiations involve

the exchange of proposals until the parties reach agreement. By stating that AEP's April draft was not offered on a "take it or leave it" basis, the district court merely noted there was no evidence that AEP was unwilling to continue negotiating the Protocol after it submitted the April draft. This observation supports the district court's ultimate conclusion that the April draft was not a bad faith attempt to frustrate the Protocol negotiations.

### B. The Credit Guaranty Increase Request

The PPSA included a Termination Payment provision that guaranteed each party's respective interest in the event of the other's default. PPSA § 7.3. To cover the Termination Payment, the parties agreed to exchange $50 million guaranties upon execution of the PPSA, and either party could seek an increase in the guaranty if it had "reasonable grounds to believe" that its counterpart's exposure under the PPSA exceeded $50 million. PPSA §§ 7.1.2, 7.2.2. Exhibit 7.1.2 provided that, in calculating the projected Termination Payment, the market price of the products sold to TEMI "shall be based on broker, dealer or exchange quotations" for the subsequent five years, escalating at 3 percent per year through the remaining term of the PPSA. On May 12, 2003, believing TEMI's exposure under the PPSA to be far in excess of $50 million, AEP requested that TEMI increase the guaranty to $436 million. TEMI disputed AEP's calculation, claiming its exposure under the PPSA was no more than $33 million. On June 17, 2003, after conducting further market research, AEP determined TEMI's projected Termination Payment to be $337 million but indicated it would accept an increase in the guaranty of $100 million.

On appeal, TEMI claims AEP acted in bad faith during the credit guaranty negotiations because, in calculating TEMI's projected Termination Payment, AEP used "two-ways" to

determine the market price of the Products.[9] TEMI casts aspersion on the practice of using two-ways by referring to it as "quote-planting," and asserts that it was "attempted fraud[] on a grand scale." TEMI Br. at 58. The record, however, indicates that the use of two-ways is a common means of price discovery in the energy industry. Indeed, TEMI's Director of Risk Control acknowledged that even TEMI occasionally used two-ways to determine energy prices.

A two-way involves presenting to the market simultaneous bids and offers around an estimated current market price. If a bid is above the market price, or an offer is below, it will likely be acted on. On June 11, 2003, AEP's Marcus Moreland was asked to obtain market quotes for "into Entergy" on-peak and off-peak products for a period of five years beginning in 2004. Moreland was to obtain quotes from the four brokers upon whom AEP and TEMI agreed in a June 11 telephone conversation. On June 13, 2003, Moreland presented bids and offers to the market based on AEP's forward price curves. Moreland testified that the brokers indicated that there was market activity in response to AEP's bids/offers, causing Moreland to increase the bid/offer prices. Although there was some market activity, it was limited, and none of the bids or offers was acted on by other traders. However, Moreland stated that, in his experience,

> [P]articipants in the power trading markets will transact in instances
> where they perceive an opportunity to make a profit. The fact that
> no one transacted on my bids and offers indicated to me that those
> bids and offers reflected prevailing market prices, such that no one

[9] TEMI also claims that AEP acted in bad faith because no credit guaranty was required. We agree with the district court, however, that TEMI also recognized that an increase was required, given that most of its internal projections showed exposure far exceeding $50 million. For example, on April 25, 2003, TEMI's director of credit, Lora Kinner, reported on a conversation she had with AEP's director of credit, Frank Hilton, in which the latter said he believed TEMI's exposure to be "north of $600M." In an email to her colleagues at TEMI, Kinner stated that this number was "very close to the number provided by [TEMI] Risk Control, which was calculated in accordance with the credit provisions of the contract."

believed they would profit significantly from entering into transactions with AEP at the bid and offer prices I had put into the market.

(Moreland Decl., J.A. 6973-74 ¶ 10).

The fact that AEP's quotes were based on its own two-ways was not concealed from TEMI. Scot Marshall, TEMI's vice president responsible for power trading, testified that by simply contacting the brokers the parties had agreed to use he was able to determine, during the relevant period, that the only bid/offer quotes in the Long Term into Entergy market had come from AEP. (Marshall Decl., J.A. 4745-46 ¶¶ 15, 16). In a June 5, 2003 letter, TEMI's Robert Stibolt warned AEP's Frank Hilton that TEMI understood the PPSA to require that the market price could only be determined by using quotes that were "executable at arms-length with third parties." Stibolt stated that "bid/offers that either AEP or TEMI have provided to a dealer or broker" were unacceptable. Thus, although TEMI contested the fact that the market price could be determined by using two-ways, TEMI was certainly aware that AEP obtained its quotes by that method. Moreover, at no point did AEP ever represent that it did not employ two-ways to determine the market price, or that it obtained its quotes from arms-length transactions.

It should also be noted that AEP only requested TEMI to provide the increased guaranty to cover AEP's losses if TEMI defaulted. If TEMI did not default, the guaranty would not be invoked. Thus, the present case is unlike those cited by TEMI where bad faith was motivated by financial gain. *See, e.g.*, *Broder v. MBNA Corp.*, 281 A.D.2d 369, 370-71 (N.Y. App. Div. 2001); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Chipetine*, 221 A.D.2d 284, 287 (N.Y. App. Div. 1995). AEP did not stand to *gain* financially by increasing the credit guaranty; the guaranty served only to *insure* AEP's undisputed financial interest in the PPSA.

It may be the case that, in a totally illiquid market, two-ways do not provide the most accurate measure of market price. The reliability of two-ways in determining the price of products in the power trading market, however, is not the question before us. Rather, the issue is whether AEP's request for an increase in the guaranty was in bad faith, given that the amount requested was based on two-ways. We agree with the district court that, "[a]t worst, these facts show that no one knew what to make of a non-existent marketplace." *Tractebel*, 2005 WL 1863853, at *8, 2005 U.S. Dist. LEXIS 15972, at *29. We therefore hold that the district court's finding that AEP complied with the covenant of good faith and fair dealing was not clearly erroneous.

### III. Whether AEP Is Entitled To Damages For Replacement Products

The PPSA contemplates the use of Replacement Products[10] during certain stages of the contract period. As of target COD, and for the duration of the Delivery Period,[11] AEP was obligated to supply energy and capacity to TEMI. *See* PPSA §§ 11.4, 11.5. If AEP could not meet TEMI's needs with energy/capacity from the Plaquemine Facility, AEP was obligated to provide TEMI with Replacement Products. *See id.* Thus, in the event of an unplanned outage, or if target COD preceded actual COD, AEP was nevertheless obligated to satisfy TEMI's Delivery Notices[12] with "substantially equivalent" Products from other sources. *See id.*; PPSA § 1.133. If

---

[10] "'Replacement Products' are any Capacity, Energy, or Ancillary Services from a generation source other than the Project substantially equivalent to the Product intended to be replaced." PPSA § 1.133.

[11] "'Delivery Period' means the period beginning with the first hour of Target COD and ending at midnight, April 30, 2023 . . . ." PPSA § 1.56.

[12] A "Delivery Notice" is a "Dispatch order from [TEMI] to generate electricity at the Project in accordance with the delivery procedures set out in this Agreement directing the

AEP failed to provide Replacement Products, TEMI could cover and AEP would be obligated to pay TEMI the Replacement Price.[13] *See* PPSA §§ 11.4, 11.5.

AEP argues that the Replacement Products provisions must be read in light of the Minimum Must Take obligation (PPSA § 3.1.4.4) and the Capacity Payment obligations (PPSA §§ 5.1.1, 5.2.1, 5.3.1), such that these obligations applied in the pre-COD period. Thus, according to AEP, rather than affording TEMI the *right* to call on Replacement Products in the pre-COD period, the Replacement Products provisions, in conjunction with the must-take and capacity payment provisions, *obligated* TEMI to take and pay for Replacement Products, whether it requested them or not.

AEP's interpretation of the PPSA is erroneous for three reasons. First, the must-take obligation did not apply prior to actual COD. Second, while the capacity payment provision technically applied as of target COD, unless TEMI requested, and AEP provided, replacement capacity, the Capacity Payment obligation would equate to zero dollars. Finally, the Replacement Products provisions were intended to guaranty TEMI a reliable source of energy/capacity, not to permit AEP to obtain Replacement Products cheaply on the collapsed energy market and force TEMI to buy them at the prices specified in the PPSA.

*A. The Minimum Must Take Obligation*

The Plaquemine Facility is a "cogeneration" facility – the same turbine generating units

---

delivery of one or more Products." PPSA § 1.55.

[13] "'Replacement Price' is the price at which [TEMI], acting in a commercially reasonable manner, purchases . . . a replacement for any Capacity, Energy, or Ancillary Services not delivered by [AEP], plus any additional transmission charges, if any, reasonably incurred by [TEMI] to the Delivery Point, not to exceed the market price at the Delivery Point for such Capacity, Energy or Ancillary Services." PPSA § 1.132.

that produce electricity also provide steam used in Dow's manufacturing processes. Because Dow needs large quantities of steam in its operations, the units need to run, and therefore generate power, almost constantly. This is not to say that all the units must run at maximum capacity at all times. All four units can be turned down to produce less energy. In addition, any one of the units can be turned off entirely. The remaining three units, however, have to be on line in order to provide enough steam for Dow to operate its plant.

Even when only three units are in operation and the units are turned down, they produce a certain amount of electricity. Under the deal between AEP and Dow, AEP agreed to build and operate the Plaquemine Facility and committed to purchase from Dow the electricity produced. To ensure that AEP would have a buyer for that electricity, AEP entered into the PPSA with TEMI. The PPSA gave TEMI the exclusive right to the energy produced by the Facility, but also obligated TEMI to take and pay for the minimum amount of energy produced by the operating units. Section 3.1.4.4 of the PPSA provides that TEMI "must at all times during the Delivery Period request, take and pay for delivery of Baseload Capacity and Baseload Energy at the sum of (a) the minimum output level set forth in Exhibit 3.1.4.4 and (b) the Nomination in effect from time to time." *Id.* If TEMI requested less than the sum of the minimum output level and the effective nomination, AEP could automatically amend TEMI's Delivery Notice to reflect the appropriate sum. *Id.*

AEP argues that TEMI's must-take obligation commenced as of target COD, or May 1, 2003, despite the fact that the Facility was not then operational. AEP bases its argument on the language in section 3.1.4.4, which states that the must-take clause applies "at all times during the Delivery Period." The Delivery Period is defined in the PPSA as "the period beginning with the

first hour of target COD and ending at midnight, April 30, 2023 . . . ." PPSA § 1.56. AEP's interpretation of this language conflicts with the obvious purpose of the must-take clause. Once the Plaquemine Facility was operational, AEP was obligated to keep three units running in order to produce steam for Dow; the must-take clause ensured AEP would have a buyer for the attendant energy produced by the units. Indeed, the must-take clause itself states that if AEP's obligation to supply steam to Dow ever ceased, the minimum output levels set forth in Exhibit 3.1.4.4, and therefore the must-take obligation, no longer applied.[14] Thus, the applicability of the must-take clause was contingent on AEP's obligation to supply steam to Dow. Prior to actual COD, the Facility produced neither steam nor electricity, and, therefore, AEP had no need for a guaranteed purchaser of electricity.

AEP insists that because section 3.1.4.4 states that the must-take obligation commenced at target COD, not actual COD, TEMI must have been obligated to take and pay for a minimum amount of energy despite the fact that the Facility produced none. In AEP's view, the must-take clause applied even if AEP was supplying power to TEMI entirely from external sources – i.e., with Replacement Products. However, AEP fails to explain how to calculate the minimum must-take amount in such circumstances. Section 3.1.4.4 indicates that the must-take obligation is the sum of "(a) the minimum output level set forth in Exhibit 3.1.4.4 and (b) the Nomination in effect from time to time." AEP concedes that prior to actual COD the Nomination could never be other than zero, but claims that TEMI was nevertheless obligated to take and pay for the minimum

_____

[14] The must-take clause provides, "If the Facility shall no longer be subject to operational constraints related to [AEP's] obligation to supply steam, the minium output level set forth in Exhibit 3.1.4.4 shall no longer apply. [TEMI] shall either Dispatch each Unit at zero or above a minimum operating level to be established . . . ." PPSA § 3.1.4.4.

output levels set forth in Exhibit 3.1.4.4. That exhibit, however, only identifies minimum output levels for the actual Plaquemine units. The two tables contained in the Exhibit identify the minimum amount of energy that must be produced and purchased when either three or four Plaquemine units are running. But, if no units are running, the tables are inapplicable.

Section 3.1.4.4 does not provide a method of calculating TEMI's minimum must-take obligation if AEP is able to provide power only from external sources. AEP's solution to this perceived lacuna in the contract was to "deem" three or four units to be running based on the amount of energy TEMI requested. In doing so, AEP created a solution to a problem that did not exist. The PPSA contained no provision for determining TEMI's minimum must-take obligation prior to actual COD because there was no such obligation. The must-take provision only made sense once the Facility was operational and AEP was obligated to keep the units on line in order to supply steam to Dow.

### B. The Capacity Payment Provisions

Section 5.1.1 ("Payment for Baseload Capacity") provides,

> Commencing with the Target COD and for the duration of the Delivery Period, [AEP] shall sell and [TEMI] shall purchase and pay for the Baseload Capacity. For each calendar month during the Delivery Period, [TEMI] shall pay [AEP] an amount (the "Baseload Capacity Payment") equal to the product of (a) the Baseload Capacity Payment Price multiplied by (b) the Baseload Contract Capacity for the applicable month multiplied by (c) the Baseload Availability Adjustment. [TEMI] shall be obligated to make the Baseload Capacity Payment under all circumstances without regard to, *inter alia*, whether [AEP] shall deliver any Energy or Ancillary Services associated with Baseload Capacity, whether [AEP] supplies Replacement Products at any time as of Target COD or during the Delivery Period[,] or whether at any time [TEMI] elects

to receive less than the entire Baseload Product.[15]

Although 5.1.1 states that the Baseload Capacity Payment obligation commenced at target COD, it is possible for the Baseload Capacity Payment to be zero dollars. Variable (c), the Baseload Availability Adjustment, is calculated by reference to a formula provided in section 5.1.2.2. If there is no actual baseload capacity, and no replacement baseload capacity, the formula results in a Baseload Availability Adjustment of zero percent. If such is the case, and variables (a) and (b) are multiplied by (c), the total Baseload Capacity Payment is zero, since any number multiplied by zero percent is zero. The PPSA explicitly contemplates this possibility: Section 5.1.2.3 ("Maximum Adjustment") provides that "[i]n no event and under no circumstances shall [TEMI's] Baseload Capacity Payment for a given month be less than zero." Thus, in some months, the Baseload Capacity Payment *might* be zero.

This is not to say that the Baseload Availability Adjustment was necessarily zero in all pre-COD months. The Baseload Availability Adjustment could be greater than zero pre-COD if Replacement Power was used. *See* PPSA § 5.1.2.2. A letter from TEMI's Joey Moreland to AEP's Ross Metersky, providing sample calculations for hypothetical pre-COD scenarios, suggests that TEMI also held this view. In that case, however, the Payment Obligation would be contingent on TEMI actually requesting, and AEP providing, Replacement Products. As discussed in the next section, in the pre-COD period it was TEMI's *option* to request Replacement Products; TEMI was not *obligated* to request Replacement Products. Thus, if in the pre-COD

---

[15] Sections 5.2.1 and 5.3.1 are identical but apply to Baseload Augmentation Capacity and Steam Peaking Capacity, respectively. The analysis that follows applies equally to those sections.

period TEMI requested no Replacement Products, or if AEP provided none, the Baseload Capacity Payment would be zero dollars.

### C.  The Replacement Products Provisions

Section 2.3.1 provides, "In the event [AEP] is unable to make any Product(s)[16] available at the Delivery Point[17] in accordance with the then effective Delivery Notice, [AEP] shall have the right to deliver Replacement Product(s) at the Delivery Point . . . ."  Sections 2.3.3.1 ("First Replacement Period") and 2.3.3.2 ("Subsequent Periods") indicate that AEP's "right" to provide Replacement Products in 2.3.1 was intended to apply during unplanned outages at the Plaquemine Facility.  Thus, TEMI could tender Delivery Notices and expect to have them fulfilled even if there was an outage at the Facility, but AEP had the right to satisfy those notices with Replacement Products from external sources.  In addition, sections 11.4 and 11.5 explain that if target COD preceded actual COD, then AEP was obligated to meet TEMI's Delivery Notices with Replacement Products, as "*requested by [TEMI]*."  PPSA §§ 11.4, 11.5 (emphasis added).  If AEP failed to do so, TEMI was permitted to obtain Replacement Products from other sources and send the bill to AEP.

What is important to note about sections 2 and 11 is that Replacement Products were only to be provided upon TEMI's request.  Replacement Products could only be supplied pursuant to section 2.3.1 "in accordance with the then effective Delivery Notice." PPSA § 2.3.1.  The Delivery Notice was the order that TEMI was supposed to send AEP when it wanted one or more

---

[16] "Products" are those energy products produced at the Plaquemine Facility.  *See* PPSA §§ 1.21, 1.30, 1.126, 1.149.

[17] "Delivery Point" is "the interconnection of the Dow Chemical Complex System with the system of the Transmission Operator ."  PPSA § 4.1.

energy Products to be generated. PPSA § 1.55. If there was an unplanned outage, and TEMI did not need energy, there was no obligation for TEMI to take Replacement Products it did not want. Similarly, Replacement Products could only be supplied pursuant to sections 11.4 and 11.5 as "requested by [TEMI]." If, as in this case, actual COD was delayed, TEMI was not obligated to request Replacement Products if it had no use for them.

The Replacement Products provisions were designed to ensure that (1) as of target COD, TEMI would have a reliable source of energy from AEP, and (2) in the event of an unplanned outage, or if actual COD was delayed, AEP could satisfy its obligations to supply energy to TEMI with energy products from sources external to the Plaquemine Facility. The Replacement Products provisions did not permit AEP to force Replacement Products on TEMI if TEMI had no desire for them.

AEP argues that the Replacement Product provisions, in conjunction with the must-take and capacity payment provisions, were designed to ensure that AEP would have a stable stream of income as of target COD, from which it could recoup some of its investment in the construction of the Facility, even if the Facility was not yet operational. This argument rests on a false premise – that market conditions would always enable AEP to generate a profit by selling Replacement Products to TEMI at the prices stated in the PPSA. AEP's enthusiasm for selling Replacement Products to TEMI in the pre-COD period is explained by the collapsed price of energy in the Entergy region. AEP was able to obtain replacement energy products at significantly reduced prices, or from other AEP facilities experiencing energy surpluses, and sought to sell those products at the higher prices specified in the PPSA. If during the pre-COD period energy prices had significantly increased rather than decreased, however, there is no doubt that AEP would have

been less vehement about TEMI's alleged obligation to take and pay for Replacement Products, since supplying Replacement Products to TEMI would have left AEP with a loss.

The language and structure of the PPSA clearly indicate that TEMI was not under any obligation to take Replacement Products in the pre-COD period. Thus, we reject AEP's argument that the PPSA was designed to assure AEP a stable stream of income as of target COD.

*D. The $116.5 Million Award*

The district court awarded AEP $116.5 million for Replacement Products that AEP billed to TEMI because it found that the PPSA obligated TEMI to take and pay for Replacement Products in the period between target and actual COD. The total award includes approximately $65.8 million for replacement energy billed pursuant to the must-take clause, and $50.7 million for replacement capacity billed pursuant to the capacity payment provisions. Because these provisions, on their own, did not obligate TEMI to take and pay for Replacement Products, the award was in error.

There is some indication in the record, however, that TEMI did in fact proffer Delivery Notices during the pre-COD period directing AEP to provide Replacement Products.[18] Ultimately, TEMI rejected every offer of Replacement Products on the basis that the Products offered did not meet the PPSA's test for substantial equivalency. The district court found that the products offered by AEP were substantially equivalent, *Tractebel*, 2005 WL 1863853, at *10, 2005 U.S. Dist. LEXIS, at *21, and we see no basis in the record for declaring the district court's

---

[18] When asked whether he was familiar with the routine interaction between the parties whereby TEMI would send AEP a Delivery Notice during the Replacement Period and AEP would offer power that TEMI would ultimately reject, TEMI's manager of the Real Time Energy Trading Desk replied that he was, and that the routine became a daily process.

finding to be clearly erroneous. While we agree with TEMI that the must-take and capacity payment provisions did not *obligate* TEMI to take and pay for a minimum amount of energy and capacity, to the extent TEMI *requested* energy and capacity, it is liable for whatever damages AEP incurred in attempting to satisfy those requests. It is not clear from the record exactly what damages AEP incurred. AEP's Mark Jansen testified that AEP did not incur any costs whatsoever for the replacement energy that it billed to TEMI. It appears that AEP did incur some costs in attempting to provide TEMI with replacement capacity, however, and if such is the case TEMI is liable for the amount AEP spent in reliance on TEMI's request.

We therefore vacate the district court's judgment awarding AEP damages for Replacement Products, and remand for a reassessment of AEP's damages in light of this opinion and any further fact-finding the district court deems necessary and appropriate.

**IV. Whether AEP is Entitled to Damages Pursuant To The Termination Payment Provision**

AEP cross-appeals the district court's denial of its claim for damages pursuant to the PPSA's Termination Payment provision. Section 12 of the PPSA provides that, in the event of either party's default, the non-defaulting party is entitled to any net loss the party incurs as a result of the other party's early termination of the agreement.[19] AEP claims TEMI's repudiation of the PPSA will cause AEP to suffer a present value net loss of approximately $500 million.

The district court characterized damages pursuant to the Termination Payment provision

---

[19] The Termination Payment provision entitles the non-breaching party to a "Settlement Amount." PPSA §§ 12.2, 12.3. The Settlement Amount is defined as "Losses or Gains, and Costs . . . which [the non-defaulting] party incurs as a result of the termination of [the] Agreement." PPSA § 1.138. "Losses" are the "present value" of "the economic loss . . . (exclusive of Costs) resulting from termination of [the] Agreement," PPSA § 1.107, and "Gains" are "the present value of the economic benefit . . . resulting from the termination of [the] Agreement." PPSA § 1.83.

as "essentially a request for lost profits projected over the 20 year length of the contract" and required AEP to prove the extent of damages to a "reasonable certainty." *Tractebel*, 2005 WL 1863853, at *13, 2005 U.S. Dist. LEXIS 15972, at *41. AEP and TEMI each presented an expert witness to calculate the amount of the Termination Payment; the district court was not persuaded by either. *Id.* at *14-16, 2005 U.S. Dist. LEXIS 15972, at *44-51. Ultimately, the district court concluded that AEP failed to meet its burden of proving damages to a reasonable certainty and altogether declined to award damages pursuant to the Termination Payment provision. *Id.* at *17, 2005 U.S. Dist. LEXIS 15972, at *53. AEP requested that the district court reconsider, and urged the court to view AEP's claim as one for general, not consequential, damages. In its reconsideration order, the district court remained steadfast in its view that AEP's claim was "appropriately characterized as one for consequential damages," but stated that even under the more flexible standard for general damages, AEP failed to meet its burden of proof. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, Nos. 03-6731, 03-6770, 2006 WL 147586, *2-3, 2006 U.S. Dist. LEXIS 1702, *9, 11-12 (S.D.N.Y. Jan. 20, 2006).

We review a district court's decision to deny damages for breach of contract de novo. *See generally Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 379 (2d Cir. 2002) (holding that whether the district court correctly calculated damages is a question that we review de novo).

*A. Lost Profits As General Damages*

We do not disagree with the district court's characterization of AEP's claim as "essentially a request for lost profits." AEP sought the present value of the amount it expected to profit under the PPSA. The district court erroneously concluded, however, that the profits lost in this case were consequential damages.

Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract. When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are "lost." Every lawyer will recall from his or her first-year contracts class the paradigmatic example of *Hadley v. Baxendale*, where Baxendale's failure to deliver a crank shaft on time caused Hadley to lose profits from the operation of his mill. 9 Ex. 341, 156 Eng. Rep. 145 (1854). In New York, a party is entitled to recover this form of lost profits only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties. *See Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 261 (1986).

By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages. *See Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44 (1989). The damages may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments. But, in this case, the lost profits are the direct and probable consequence of the breach.[20] *See id.* The profits are precisely what the non-breaching party

[20] New York long ago clarified the distinction between profits as general or consequential damages in *Masterton & Smith v. Mayor of Brooklyn*, 7 Hill 61, 68-69 (N.Y. Sup. Ct. 1845):

bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed.[21] *See id.*

In characterizing AEP's claim as one for consequential damages, the district court confused the benefit of the bargain with speculative profits on collateral transactions. *See id.*; *see also Markowitz & Co. v. Toledo Metro. Housing Auth.*, 608 F.2d 699, 707 (6th Cir. 1979). AEP seeks only what it bargained for – the amount it would have profited on the payments TEMI promised to make for the remaining years of the contract. This is most certainly a claim for general damages.

### B. Estimating General Damages

It has long been established in New York that a breaching party is liable for all direct and proximate damages which result from the breach. *Wakeman v. Wheeler & Wilson Mfg. Co.*, 56 Sickels 205, 209, 4 N.E. 264, 266 (1886). The damages, however, "must be not merely speculative, possible, and imaginary, but they must be *reasonably certain* and such only as

> When the books and cases speak of the profits anticipated from a good bargain as matters too remote and uncertain to be taken into [] account in ascertaining the true measure of damages, they usually have reference to dependant and collateral engagements entered into on the faith and in expectation of the performance of the principal contract . . . . But profits or advantages which are the direct and immediate fruits of the contract entered into between the parties stand upon a different footing . . . . [I]t is difficult to comprehend why, in case one party has deprived the other of the gains or profits of the contract by refusing to perform it, this loss should not constitute a proper item in estimating the damages.

[21] The non-breaching party is, of course, under a duty to mitigate damages to the extent practicable, *see Losei Realty Corp. v. City of New York*, 254 N.Y. 41, 47 (1930), and any proceeds generated from mitigation should be accounted for in the ultimate award of damages.

actually follow or may follow from the breach of the contract." *Id.* (emphasis added).

"Certainty," as it pertains to general damages, refers to the *fact* of damage, not the amount. For "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain."[22] *Id.* "[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer . . . ." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977) (applying New York law). "The plaintiff need only show a 'stable foundation for a reasonable estimate'" of the damage incurred as a result of the breach. *Id.* (quoting *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383 (1974)). "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection."

_____

[22] In *Story Parchment Company v. Paterson Parchment Paper Company*, the United States Supreme Court quoted the following discussion with approval:

> It is sometimes said that speculative damages cannot be recovered, because the amount is uncertain; but such remarks will generally be found applicable to such damages as it is uncertain whether sustained at all from the breach. . . . The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain. The latter description embraces, as I think, such only as are not the certain result of the breach, and does not embrace such as are the certain result, but uncertain in amount.

282 U.S. 555, 562-63 (1931) (internal quotation marks and citation omitted). *Accord New York Trust Co. v. Island Oil & Transp. Corp.*, 34 F.2d 653, 654 (2d Cir. 1929) (Hand, *J.*) ("It is, indeed, one of the consequences of the doctrine of anticipatory breach that, if damages are assessed before the time of performance has expired, the court must take the chance of forecasting the future as best it can."); *Borne Chemical Co., Inc. v. Dictrow*, 85 A.D.2d 646, 651 (N.Y. App. Div. 1981).

*Entis v. Atl. Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964).

While certainty of amount is not an element of general damages in New York, it is an element of consequential damages. In addition to proving that the *existence* of damage is reasonably certain, and that the damages were foreseeable and within the contemplation of both parties, a party claiming consequential damages must also prove the *amount* of damage with "reasonable certainty." *Kenford*, 67 N.Y.2d at 261. Thus, there exists a higher burden for proving consequential damages than for general damages. This is the burden that the district court erroneously imposed on AEP.

The district court erred in requiring AEP to prove the extent of its damages to a reasonable certainty.[23] The law of New York is clear that once the fact of damage is established,[24] the non-breaching party need only provide a "stable foundation for a reasonable estimate [of damages]"

---

[23] We acknowledge that in its reconsideration order the district court stated that "any estimate of damages, even by [the general damages] standard, must be reasonable, and uncertainty especially in a market such as this must be considered." *Tractebel*, 2006 WL 147586, at *3, 2006 U.S. Dist. LEXIS 1702, at *10. Based on this statement, TEMI argues that the district court rejected AEP's claim under either standard. We are not confident the district court fully analyzed AEP's claim under the standard for general damages, since both cases cited by the district court to support its statement involve claims for consequential damages. *Id.* (citing *Wolff & Munier*, 946 F.2d at 1010 and *Isaac H. Blanchard Co. v. Rome Metallic Bedstead Co.*, 184 A.D. 187, 193 (N.Y. App. Div. 1918)).

[24] The district court impliedly found that AEP suffered at least some damage by TEMI's repudiation of the PPSA, for it rejected as illogical TEMI's argument that AEP actually benefitted from TEMI's repudiation of the PPSA. *Tractebel*, 2005 WL 1863853, at *15, 2005 U.S. Dist. LEXIS 15972, at *47-48. The court noted that TEMI's expert's analysis "defies common sense because it implies not only that the Plaquemine plant revenues (without the PPSA) will far exceed [AEP's expert's] estimate, but that they are in fact much greater than the payments TEMI would have made to AEP under the PPSA. Put another way, according to [TEMI, it] is actually harmed by the termination of the PPSA . . . ." *Id.*

before an award of general damages can be made. *Freund,* 34 N.Y.2d at 383.

The district court noted that "it is inherently speculative" to determine AEP's loss over the twenty-year period, and that the method offered for determining AEP's loss "required a large number of assumptions." *Tractebel*, 2005 WL 1863853, at *16, 2005 U.S. Dist. LEXIS 15972, at *50 (internal quotation marks omitted). The court further stated:

> In order to know what AEP's revenues would be over the next twenty years, one would have to be able to presage a vast and varied body of facts. Any projection of lost profits would necessarily include assumptions regarding the price of electricity and the costs of operating over twenty years. One would also need to surmise what competing forms of energy such as coal and nuclear energy would cost over the same time period. Also factoring into this calculation are the political and regulatory developments over twenty years, population growth in the Entergy region, and technological advances affecting the production of power and related products. With so many unknown variables, these experts might have done as well had they consulted tealeaves or a crystal ball.

*Id.*

Not a single product or service exists for which a company's profit margin, over time, is unaffected by fluctuating supply and demand, changes in operating costs, increased competition from alternatives, alterations to the relevant regulatory regime, population increases or decreases in the targeted market, or technological advances. The variables identified by the district court exist in every long-term contract. It is not the case that all such contracts may be breached with impunity because of the difficulty of accurately calculating damages.

New York courts have significant flexibility in estimating general damages once the fact of liability is established. *Contemporary Mission*, 557 F.2d at 926; *New York Trust Co.*, 34 F.2d

at 654; *Randall-Smith, Inc. v. 43rd St. Estates Corp.*, 17 N.Y.2d 99, 105-06 (1966); *Wakeman*, 56 Sickels at 209, 4 N.E. at 266; *Dictrow*, 85 A.D.2d at 651. To the extent certain variables must be assumed in order to arrive at a reasonable estimate, the district court may do so, unless evidence is presented that undermines the basis for the assumption. For example, while changes in the political and regulatory environments would likely affect AEP's profit margin, and thus the extent of AEP's actual damages, if there is currently no evidence of an impending change the district court may assume these environments will remain stable. This is precisely what the parties did when they estimated the value of the PPSA prior to signing.[25] The risk that the future might reveal the district court's assumptions to be false is appropriately borne by TEMI as the breaching party.[26] *Contemporary Mission, Inc.*, 557 F.2d at 926.

We therefore vacate the district court's judgment denying AEP damages pursuant to the Termination Payment provision. We remand for reconsideration of AEP's damages under the appropriate standard, and for any further fact-finding the district court deems appropriate or

---

[25] The record contains internal TEMI memoranda that show that, prior to entering the PPSA, TEMI assessed the risk that certain variables might change in such a way as to adversely affect TEMI's financial interest in the deal. TEMI concluded that political, regulatory, and market risks were low.

[26] It is no less speculative for the district court to determine AEP's loss over the twenty-year period than it is was for TEMI to calculate its expected profit from the PPSA at the time it entered into the agreement. The district court stated that the parties' respective experts could "have done as well had they consulted tealeaves or a crystal ball." If it is true that projecting profits over twenty years is so absurdly speculative that economists can do no better than fortune tellers, it would have been imprudent for the parties to enter a contract for such a long period in the first place. The reality, however, is that long-term contracts are entered into regularly, and a degree of speculation is acceptable in the business community.

necessary.

## V.  Other Claims

TEMI also argued that the district court erred in denying its primary jurisdiction motion, and in finding that AEP satisfied the PPSA's requirement that AEP use reasonable efforts to obtain QF certification.  We affirm the decision of the district court on these issues for substantially the same reasons stated below.

## VI.  Conclusion

The district court's judgment is AFFIRMED on the following issues: (1) whether the PPSA is enforceable; (2) whether AEP violated the covenant of good faith and fair dealing; and (3) whether AEP used substantial efforts to obtain QF certification.  The district court's award of damages to AEP for Replacement Products is VACATED.  The district court's denial of damages to AEP pursuant to the Termination Payment provision is also VACATED.  Accordingly, we REMAND for further proceedings consistent with this opinion.