[11 NE3d 676, 988 NYS2d 527]

BIOTRONIK A.G., Appellant, v CONOR MEDSYSTEMS IRELAND, LTD., et al., Respondents.

Argued January 7, 2014; decided March 27, 2014

800

## POINTS OF COUNSEL

*Proskauer Rose LLP*, New York City (*Ronald S. Rauchberg* and *Anna G. Kaminska* of counsel), and *Vandenberg & Feliu LLP* (*Bertrand C. Sellier* of counsel) for appellant. I. The Appellate Division erred in concluding that Biotronik A.G. seeks consequential damages. (*Kerr S.S. Co. v Radio Corp.*, 245 NY 284; *Wood v Duff-Gordon*, 222 NY 88; *American List Corp. v U.S. News & World Report*, 75 NY2d 38; *Orester v Dayton*

*Rubber Mfg. Co.*, 228 NY 134; *Compania Embotelladora Del Pacifico, S.A. v Pepsi Cola Co.*, 650 F Supp 2d 314; *Woods v MONY Legacy Life Ins. Co.*, 84 NY2d 280; *DP Serv., Inc. v AM Intl.*, 508 F Supp 162; *Appliance Giant, Inc. v Columbia 90 Assoc., LLC*, 8 AD3d 932.) II. Any doubt about whether Biotronik A.G.'s damages are direct or consequential would present a factual question for the jury. (*Long Is. Light. Co. v Transamerica Delaval, Inc.*, 646 F Supp 1442; *American Elec. Power Co., Inc. v Westinghouse Elec. Corp.*, 418 F Supp 435.) III. Biotronik A.G.'s damages are not limited to the time period through April 2008. (*Simon v Electrospace Corp.*, 28 NY2d 136; *Orange & Rockland Util. v New England Petroleum Corp.*, 60 AD2d 233.)

*Kramer Levin Naftalis & Frankel LLP*, New York City (*Harold P. Weinberger, Kerri Ann Law* and *Jared I. Heller* of counsel), for respondents. I. The order should be affirmed because Biotronik A.G.'s claim for lost profits is barred under the agreement. (*Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430; *Matter of Garner v New York State Dept. of Correctional Servs.*, 10 NY3d 358; *American List Corp. v U.S. News & World Report*, 75 NY2d 38; *Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc.*, 487 F3d 89; *International Gateway Exch., LLC v Western Union Fin. Servs., Inc.*, 333 F Supp 2d 131; *Compania Embotelladora Del Pacifico, S.A. v Pepsi Cola Co.*, 650 F Supp 2d 314; *Kenford Co. v County of Erie*, 67 NY2d 257; *Appliance Giant, Inc. v Columbia 90 Assoc., LLC*, 8 AD3d 932; *Canusa Corp. v A & R Lobosco, Inc.*, 986 F Supp 723; *County Asphalt, Inc. v Lewis Welding & Eng'g Corp.*, 444 F2d 372.) II. Biotronik A.G. cannot recover its lost profits from after April 2008. (*V.S. Intl., S.A. v Boyden World Corp.*, 862 F Supp 1188; *Deutsch v Health Ins. Plan of Greater N.Y.*, 751 F2d 59; *Custen v Robison*, 180 App Div 384.) III. If the court determines that Biotronik A.G.'s lost profits are not barred under the agreement, this matter should be remitted to the Appellate Division for consideration of Conor Medsystems Ireland, Ltd.'s cross appeal. (*Matter of New York City Tr. Auth. v State of N.Y., Exec. Dept., Div. of Human Rights*, 89 NY2d 79; *Morgenthau v Citisource, Inc.*, 68 NY2d 211.)

## OPINION OF THE COURT

RIVERA, J.

In this breach of contract action, plaintiff sought lost profits from an exclusive distribution agreement as general damages. We hold that lost profits were the direct and probable result of a

breach of the parties' agreement and thus constitute general damages.

## I.

In May 2004, plaintiff Biotronik A.G., a manufacturer and distributor of medical devices, and defendant Conor Medsystems Ireland, Ltd., the developer and manufacturer of CoStar, a drug-eluting coronary stent, entered an agreement designating plaintiff as the exclusive distributor of CoStar for a worldwide market territory excluding the United States and certain other countries.[1] The geographic territory covered by the agreement included countries in which plaintiff had an existing direct sales business.[2] The agreement allowed defendant to take advantage of plaintiff's distribution business and sales force in order to penetrate the market.

Under the agreement, plaintiff served as defendant's "distributor . . . with respect to [CoStar] for sale to any purchasers for use (or for re-sale in the case of [plaintiff]'s sub-distributors)" in the designated territory. The agreement required plaintiff "[t]o use commercially reasonable efforts to promote, market, and distribute [the stents]" in the territory. Plaintiff agreed to supply defendant with "all reasonably required support to comply with any local regulatory law and requirement" and to assist defendant with the registration of its trademarks. Thus, defendant relied on plaintiff's expertise in handling a wide range of regulatory matters in order to make sales of CoStar possible.

Nonetheless, defendant maintained direct involvement in the marketing and sale of CoStar. For example, the agreement required that plaintiff use only defendant's sales and technical literature, which had to display references to defendant and plaintiff in equal prominence. Plaintiff's translations of these materials were subject to defendant's final approval. Defendant would supply training support and sales samples, including free initial training, and would provide additional sales training, for a fee, as requested by plaintiff. Thus, defendant retained considerable influence over the quality and nature of CoStar's sales and marketing.

---

**1.** The agreement specified the territory as "Worldwide, except for Japan, United States, India, Pakistan, Australia, New Zealand, Kenya, Sri Lanka, Tanzania, and Korea."

**2.** The agreement specified Austria, Belgium, Brazil, China, Czech Republic, France, Germany, Hungary, Israel, Italy, Lithuania, Netherlands, Poland, Russia, Spain, Denmark, Switzerland, and United Kingdom as countries where plaintiff would conduct direct sales.

The agreement was not a simple resale contract, where one party buys a product at a set price to sell at whatever the market may bear. Rather, the price plaintiff paid defendant reflected the actual sales, and sales price, of CoStar stents. The agreement required plaintiff to pay defendant a transfer price calculated as a percentage of plaintiff's net sales of CoStar: 61% for direct sales and 75% for indirect sales.[3] Each quarter, the parties would calculate a minimum price based on net sales during the preceding quarter. Plaintiff remained obligated to pay defendant the full transfer price for its sales, even when the actual sales price exceeded the minimum price. Thus, the contract would only operate if plaintiff sold stents, and the payment defendant received bore a direct relationship to the market price plaintiff could obtain.

The agreement further required plaintiff to provide defendant with a forecast, updated monthly, which predicted plaintiff's intended purchases for the upcoming 12-month period. The purpose of the forecast was to facilitate plaintiff's "marketing plans" and permit defendant and its suppliers "to meet their lead times" for CoStar. The agreement required plaintiff to make a minimum monthly order, but defendant could limit the maximum order to 130% of the most recently forecasted quantity. Thus, the agreement guaranteed defendant a set number of sales each month, but defendant could cap the number of orders it filled even when plaintiff was ready, willing, and able to sell more stents.

The agreement allowed defendant to terminate immediately in the event of a change of control of plaintiff "that has, or in the reasonable opinion of [defendant] could have, a material adverse effect on the distribution" of CoStar.

The agreement included a damages limitation provision restricting the parties to general damages:

> "NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGE WITH RESPECT TO ANY CLAIM ARISING OUT OF THIS AGREEMENT (INCLUDING WITHOUT LIMITATION ITS PERFORMANCE OR BREACH OF THIS AGREEMENT) FOR ANY REASON."

---

**3.** Indirect sales were sales made by affiliates.

The agreement was to be governed by New York law. Its term was through December 31, 2007, and it provided for an automatic one year renewal, absent a timely termination notice from either party.

When the parties entered the agreement, defendant had not received regulatory approval for CoStar from either the European authorities or the United States Food and Drug Administration (FDA). However, the agreement anticipated that CoStar would pass regulatory hurdles following ongoing tests in certain European countries. In February 2006, after defendant obtained European regulatory approval, plaintiff began distributing CoStar.

In February 2007, Johnson & Johnson acquired defendant. At the time of the acquisition, Johnson & Johnson marketed another drug-eluting stent, known as Cypher, which was directly competitive with CoStar. Also at this time, defendant was engaged in a drug trial to secure FDA approval to distribute CoStar in the United States. According to plaintiff, defendant used a substantially different product during this trial than it had in its European trials.

In May 2007, defendant announced that the FDA trials could not establish that CoStar was equivalent to Taxus, a widely marketed stent manufactured by Boston Scientific. Based on these results, defendant terminated its FDA application and notified plaintiff that it was recalling CoStar and removing it from the worldwide market. Defendant paid plaintiff 8,320,000 Euros and a 20% handling fee to satisfy its recall obligations under the agreement.

## II.

In November 2007, plaintiff sued defendant for breach of contract and sought damages for lost profits related to its resale of the stents. Plaintiff argued that its claim for lost profits on the resale of CoStar constituted general damages, falling outside the scope of the agreement's limitation on recovery.

Defendant moved for summary judgment on both liability and damages. Supreme Court denied summary judgment on the question of liability, concluding that disputed issues of fact remained as to whether defendant breached the agreement (*Biotronik, A.G. v Conor Medsystems Ireland, Ltd.*, 33 Misc 3d 1219[A], 2011 NY Slip Op 51980[U] [2011]). However, Supreme Court also concluded that the lost profits sought by plaintiff

were consequential damages and subject to the agreement's damages limitation provision, leaving plaintiff with claims for only nominal and other damages. By denying plaintiff lost profits as a remedy, Supreme Court effectively ended the lawsuit, and the court entered a judgment dismissing the complaint.

Plaintiff appealed to the Appellate Division, which affirmed the judgment, concluding that plaintiff's claim for lost profits was barred by the agreement's limitation on consequential damages (*Biotronik A.G. v Conor Medsystems Ireland, Ltd.*, 95 AD3d 724, 725 [1st Dept 2012]). The Appellate Division granted plaintiff leave to appeal to this Court and certified a question asking whether its order was "properly made" (2012 NY Slip Op 85229[U] [2012]).

██ We agree with plaintiff that damages must be evaluated within the context of the agreement, and that, under the parties' exclusive distribution agreement, the lost profits constitute general, not consequential, damages.

## III.

Based on the damages limitation provision of the agreement, plaintiff may only recover lost profits if they are general damages.[4] The limitations provision does not specifically preclude recovery for lost profits, nor does it explicitly define lost profits as consequential damages. We thus turn to our precedent for guiding principles to assist in determining whether, under this agreement, plaintiff's lost profits are general damages and therefore recoverable.

General damages "are the natural and probable consequence of the breach" of a contract (*American List Corp. v U.S. News & World Report*, 75 NY2d 38, 43 [1989]; *Kenford Co. v County of Erie*, 73 NY2d 312, 319 [1989]). They include "money that the breaching party agreed to pay under the contract" (*Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc.*, 487 F3d 89, 109 [2d Cir 2007], citing *American List Corp.*, 75 NY2d at 44). By contrast, consequential, or special, damages do not "directly flow from the breach" (*American List Corp.*, 75 NY2d at 43).

"The distinction between general and special contract damages is well defined but its application to specific contracts and

***

4. Contract provisions limiting remedies are enforceable unless they are unconscionable (*Wilson Trading Corp. v David Ferguson, Ltd.*, 23 NY2d 398, 403 [1968]). In this case, plaintiff does not argue that the limitation is unconscionable.

controversies is usually more elusive" (*id.*). Lost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are "the direct and immediate fruits of the contract" (*see Tractebel*, 487 F3d at 109 n 20, citing *Masterton & Smith v Mayor of Brooklyn*, 7 Hill 61, 68-69 [1845]). Otherwise, where the damages reflect a "loss of profits on collateral business arrangements," they are only recoverable when "(1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties" (*Tractebel*, 487 F3d at 109, citing *Kenford Co. v County of Erie*, 67 NY2d 257, 261 [1986]).

Lost profits from the breach of a distribution contract are subject to these principles, and we have recognized such profits as general damages where the nature of the agreement supported a conclusion that they flowed directly from the breach. In *Orester v Dayton Rubber Mfg. Co.* (228 NY 134 [1920]), a case involving a distribution agreement where the issue was the proper measure of damages, we treated lost profits as general damages for breach of an exclusive distribution agreement. In *Orester*, the manufacturer of a particular brand of tires sought to penetrate the market in Onondaga and neighboring counties through an exclusive distribution agreement with the plaintiff. Under the agreement, the manufacturer sold and supplied its tires to plaintiff at a reduced price, and plaintiff agreed to "aggressively push" the sale of the tires within an exclusive territory. After plaintiff sold 200 tires under the contract, defendant refused to provide more tires, and plaintiff sued for lost profits. We stated that the buyer's damages were limited to "only those that would naturally arise from the breach itself, or those that might reasonably be supposed to have been contemplated by the parties when the contract was made." (*Orester*, 228 NY at 137). We held that those damages included net profits from the sale of the tires (*id.* at 138-139). We observed that the contract "contemplated building up a business for the sale of the [seller's tires] and creating a demand for that particular tire" (*id.* at 138). We concluded that the plaintiff's resale profits were not the result of "collateral engagements or consequential damages" (*id.*). Instead, the profits "if reasonably certain, may be said to measure the value of the contract to the plaintiff" (*id.* at 138-139). Lost profits were, accordingly, the natural and probable consequence of defendant's breach.

In *American List Corp. v U.S. News & World Report* (75 NY2d 38 [1989]), we concluded that lost profits denied plaintiff were the natural and probable consequence of defendant's breach (*id.* at 43-44). The case involved a contract that obligated the defendant to a 10-year rental of mailing lists compiled by the plaintiff. At the time of the agreement, defendant sought to expand its readership to the college student market. Plaintiff did not yet have mailing lists of college students, and defendant agreed to finance start-up costs through higher fees for the first five years. Attached to the agreement was a schedule of the plaintiff's estimated annual losses and profits. Further, the agreement required an annual review of the estimated figures in order to "adjust[ ] the cost per name to be charged to defendant" (*id.* at 41). Plaintiff provided, and the buyer purchased, names sufficient to conduct three mailings during a 1¹/₂-year period. A year after the parties signed the contract, defendant was purchased by a new owner, who canceled the contract.

We concluded that plaintiff could recover as general damages "moneys which defendant undertook to pay under the contract" (*id.* at 43). The schedule of plaintiff's estimated losses and profits "reflected the cost of this joint venture to defendant" (*id.* [internal quotation marks omitted]). Accordingly, the lost profits were the natural and probable consequence of defendant's breach (*id.* at 43-44).

Defendant relies on *Compania Embotelladora Del Pacifico, S.A. v Pepsi Cola Co.* (650 F Supp 2d 314 [SD NY 2009]) for its argument that plaintiff cannot recover lost profits as general damages. However, *Compania*, like *Orester* and *American List*, took a careful look at the underlying agreement to determine whether lost profits were general damages. In *Compania*, the parties entered an exclusive bottler agreement under which the defendant authorized the plaintiff to bottle, sell and distribute Pepsi Cola to a designated area in Peru. Over the course of several years, the parties complied with the agreement until, eventually, the defendant failed to prevent a competitor from selling Pepsi in plaintiff's exclusive distribution area. The District Court for the Southern District of New York concluded that plaintiff could not recover its lost profits. The court stated that lost profits are consequential damages "when, as a result of the breach, the non-breaching party suffers loss [of] profits on collateral business relationships" (*id.* at 322, quoting *Tractebel*, 487 F3d at 109). The plaintiff sought "lost profits from lost sales to third-parties that are not governed" by the agreement,

which the court concluded were consequential damages (*id.*). Had plaintiff sought lost profits "caused by the breach," or under "an existing resale contract," or under an "exclusive distributorship agreement," the damages would have been general, not consequential (*id.*). Instead, plaintiff sought only lost profits that were the result of collateral business arrangements, which it could not collect as general damages.

The distinction at the heart of these cases is whether the lost profits flowed directly from the contract itself or were, instead, the result of a separate agreement with a nonparty (*see e.g. Appliance Giant, Inc. v Columbia 90 Assoc., LLC*, 8 AD3d 932 [3d Dept 2004] [Supreme Court erred when it included loss from subsidiary rental contracts as general damages in a breach of a lease agreement]; *In re CCT Communications, Inc.*, 464 BR 97 [SD NY 2011] [classifying as consequential damages lost profits earned through third-party contracts for telecommunications services]; *International Gateway Exch., LLC v Western Union Fin. Servs., Inc.*, 333 F Supp 2d 131 [SD NY 2004] [lost profits on a third-party distribution contract were consequential damages]). This distinction does not mean that lost resale profits can never be general damages simply because they involve a third-party transaction. Such a bright-line rule violates the case-specific approach we have used to distinguish general damages from consequential damages (*American List Corp.*, 75 NY2d at 42-43; *Kenford Co.*, 73 NY2d at 319; *Orester*, 228 NY 138-139).[5] The present case illustrates the wisdom of our traditional approach.

Here, the agreement used plaintiff's resale price as a benchmark for the transfer price. The contract clearly contemplated that plaintiff would resell defendant's stents. That was the very essence of the contract. Any lost profits resulting from a breach would be the "natural and probable consequence" of that breach (*Tractebel*, 487 F3d at 108; *American List Corp.*, 75 NY2d at 44).

Although the lost profits sought by plaintiff are not specifically identified in the agreement, it cannot be said that defend-

---

**5.** The dissent would rely on this bright-line rule and consign the "natural and probable consequence" test to the dustbin of legal history (dissenting op at 819-821). As the dissent must acknowledge, however, the law continues to recognize the "natural and probable consequence" to be the measure of general damages (*see id.* at 811-812). Such a test requires a court to look at the contract in its entirety to determine the probable consequences that will befall a non-breaching party, not simply to turn to a schedule of payments and conclude that the inquiry is at an end.

ant did not agree to pay them under the contract, as these profits flow directly from the pricing formula. The purpose of the agreement was to resell. Indeed, defendant, like the defendant in *Orester*, sought to enter a market unavailable to it by capitalizing on plaintiff's distribution network. The fact is that both defendant and plaintiff depended on the product's resale for their respective payments.

The dissent argues that plaintiff's lost profits were not a natural and probable consequence of the breach, in part, because the contract did not require any payments from defendant to plaintiff (*see* dissenting op at 816). This argument places form over substance and is not compatible with *Tractebel* and *American List*. Whether lost profits are the natural and probable result of a breach does not turn on which party actually takes out the checkbook at the end of the fiscal quarter. Instead, we look at the nature of the agreement.

█ Defendant argues, alternatively, that plaintiff's claim for lost profits must fail under UCC 2-715 (2) (a), which includes as consequential damages "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Defendant's reliance on UCC 2-715 (2) (a) is misplaced. As the Official Comment makes clear, section 2-715 (2) rejects the "tacit agreement" test for recovery of consequential damages, and follows the common-law rule that the seller is liable for consequential damages of which the seller had "reason to know." (UCC 2-715, Comment 2.) The Official Comment that "resale is one of the requirements of which the seller has reason to know" does not resolve the issue presented in this case (UCC 2-715, Comment 6).[6]

Here, the parties' agreement was not simply one between a seller and a buyer who is in the business of reselling. The agree-

___

6. Indeed, other jurisdictions have found that the UCC does not establish a categorical rule for classifying lost profits as consequential or general damages (*see e.g. ViaStar Energy, LLC v Motorola, Inc.*, 2006 WL 3075864, 2006 US Dist LEXIS 78331 [SD Ind, Oct. 26, 2006, No. 1:05-cv-1095-DFH-WTL]; *Callisto Corp. v Inter-State Studio & Pub. Co.*, 2006 WL 1240711, 2006 US Dist LEXIS 31004 [D Mass, May 4, 2006, No. 05-11953-GAO]; *Biovail Pharms., Inc. v Eli Lilly & Co.*, 2003 WL 25901513, 2003 US Dist LEXIS 27916 [ED NC, Feb. 28, 2003, No. 5:01 CV-352-BO(3)]; *Moore v Boating Indus. Assns.*, 754 F2d 698 [7th Cir 1985]; *DP Serv., Inc. v AM Intl.*, 508 F Supp 162, 167 [ND Ill 1981]). These cases reflect the notion that "section 2-715 (2) is not an exhaustive specification of the necessary and sufficient conditions for application of the concept of consequential damages" (1 James J. White et al., Uniform Commercial Code § 11:7 at 987 [Practitioner's 6th ed 2010]).

ment was much closer to the "joint venture" identified in *American List Corp.* (75 NY2d at 43). The parties negotiated a pricing formula and target volume based on the resale of CoStar. The agreement reflects defendant's anticipation and dependence on the resale, and, as such, the agreement reflects an arrangement significantly different from a situation where the buyer's resale to a third party is independent of the underlying agreement.[7]

Accordingly, the order of the Appellate Division should be reversed with costs, the case remitted to the Appellate Division for further proceedings in accordance with this opinion, and the certified question not answered as unnecessary.

READ, J. (dissenting). In May 2004, defendant-manufacturer Conor Medsystems Ireland, Ltd. et al. (Conor) and plaintiff-distributor Biotronik A.G. (Biotronik) entered into a contract (the Agreement), governed by New York law, whereby Biotronik was given the exclusive right to distribute CoStar, Conor's drug-eluting coronary stent (the stent), worldwide with the exception of the United States and nine other countries. The Agreement provided that it would expire on December 31, 2007, but that its term would automatically renew for an additional year unless one party notified the other party otherwise before July 1, 2007. The Agreement also gave Biotronik a non-exclusive four-month period after expiration to sell off inventory.In the spring of 2007, Conor received disappointing results from a clinical drug trial designed to compare the stent's performance with that of another coronary stent eluting the same drug. As a result, in May 2007, Conor, which had been acquired by Johnson & Johnson earlier in the year, recalled the stent and discontinued its manufacture and sale. Under the Agreement's provisions governing Conor's financial obligations to Biotronik in the event of a recall, Conor paid Biotronik 8,320,000 Euros, plus a 20% handling charge. This sum reimbursed Biotronik what it

---

**7.** The dissent disregards the relationship between the resale price and the transfer price, focusing instead on the fact that plaintiff would have to pay a minimum price each quarter in a hypothetical situation where it sold no product (*see* dissenting op at 814, 816). As the contract provided, however, the parties negotiated the minimum transfer price each quarter, presumably based on sales in the foregoing quarter, to serve as a benchmark price. Hypothetical disaster scenarios aside, the minimum transfer price, like other prices in the contract, responded to the market realities of the parties' quasi-joint venture, including prices in the resale market. In other words, "[w]hatever profit [plaintiff] might make was contingent on the selling prices it negotiated with its customers" (*id.*), but so too was defendant's profit.

had paid Conor to purchase the stents remaining in Biotronik's or its customers'[1] inventories, and covered Biotronik's costs associated with the recall. Additionally, Conor gave timely notice that it did not desire to extend the Agreement's term beyond its expiration date, December 31, 2007.

In November 2007, though, Biotronik sued Conor, asserting that the decision to recall the stent and withdraw it from the market breached the Agreement. Biotronik claimed that as a result of Conor's breach, it suffered damages exceeding $100 million (later scaled back by a damages expert to $85 million), consisting solely of profits allegedly lost as a result of Biotronik's inability to sell the stent to its customers through April 2009, i.e., the end of the Agreement's initial term plus the extended term and the four-month sell-off period.

The Agreement includes a limitation-of-liability provision, applicable to both parties, which precludes liability for consequential damages for any claimed breaches. The question on this appeal, then, is whether the lost profits from sales to third parties sought by Biotronik are consequential or general damages.

*American List Corp. v U.S. News & World Report* (75 NY2d 38, 42-43 [1989]) is our principal case addressing the dividing line separating lost profits that are general or direct damages, "which are the natural and probable consequence of the breach," from those that are consequential, which are "extraordinary in that they do not so directly flow from the breach."[2] U.S. News & World Report (U.S. News) cancelled its 10-year agreement with American List Corporation (American List) after a year and nine months, and American List sought to recover its lost profits for the remainder of the contract's agreed-upon 10-year period. There was an exhibit appended to and incorporated in the parties' agreement, and this exhibit set out the specific sums that U.S. News committed to pay American List for each of the 10 years. Under these circumstances—where

---

1. Biotronik's customers consisted of both end users (direct sales) and sub-distributors (indirect sales).

2. When not precluded by a limitation-of-liability clause, lost profits are recoverable as consequential damages "upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made" (*American List*, 75 NY2d at 43, citing *Kenford Co. v County of Erie*, 67 NY2d 257, 261-263 [1986] [claimed future profits from the operation of a domed sports stadium were not recoverable as consequential damages because the plaintiff could not show that such damages were caused by the breach, capable of proof with reasonable certainty and within the parties' contemplation when the contract was made]).

American List "sought only to recover moneys which [U.S. News] undertook to pay under the contract"—we held that future profits (the present value of the balance owed American List by U.S. News, less costs reasonably saved by American List on account of the breach), were general rather than consequential damages because they "flow[ed] as a natural and probable consequence of the breach" (*id.* at 43, 44).

In *Tractebel Energy Mktg., Inc. v AEP Power Mktg., Inc.* (487 F3d 89, 109 [2d Cir 2007]), where the contract was governed by New York law, the United States Court of Appeals for the Second Circuit neatly summed up our holding in *American List* as follows: "[W]hen the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages" (*id.* at 109). In such a situation, the lost profits are the appropriate measure of damages because the non-breaching party bargained for specified payments under the contract, and its profits are the difference between those payments and the cost of its own performance (*see id.*). Thus, had the contract been performed, the non-breaching party would have realized these profits as a direct consequence of the contract (*see id.* at 109-110).

The Second Circuit then set out the corollary proposition, explaining that lost profits

> "are consequential damages when, as a result of the breach, *the non-breaching party suffers loss of profits on collateral business arrangements. In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract*" (*id.* at 109 [emphasis added]).[3]

In *Tractebel* itself, AEP Power Marketing (AEP), the operator of a cogeneration facility, entered into a contract with Tractebel Energy Marketing, Inc. (TEMI) pursuant to which AEP

**3.** The Court in a footnote cited the 19th-century New York case of *Masterton & Smith v Mayor of Brooklyn* (7 Hill 61 [NY Sup Ct 1845]) for the proposition that New York "long ago clarified the distinction between profits as general or consequential damages" (*Tractebel*, 487 F3d at 109 n 20). *Masterton*, like the Second Circuit, draws a distinction between lost profits that "have reference to dependant and collateral engagements entered into on the faith and in expectation of the performance of the principal contract," which are consequential damages (*Masterton*, 7 Hill at 68), and those "which are the direct and immediate fruits of the contract entered into between the parties," which are general damages (*id.* at 69).

promised to supply energy to TEMI for a 20-year period and TEMI agreed to take a minimum level of energy at the prices stipulated in the parties' agreement. The contract provided for a Termination Payment whereby, in the event of either party's default, the non-defaulting party was entitled to any net loss incurred as a result of the other party's early termination of the contract. When the energy market collapsed, Tractebel repudiated its obligations under the contract and AEP sued for, among other things, the amount of the Termination Payment. The district court characterized these damages as " 'essentially a request for lost profits projected over the 20 year length of the contract' " (*id.* at 108), and therefore considered them to be consequential damages.

Applying our ruling in *American List*, the Second Circuit remarked that the district court, in calling AEP's claim "one for consequential damages, [had] confused the benefit of the bargain with speculative profits on collateral transactions" (*id.* at 110). Instead, "AEP [sought] only what it bargained for—the amount it would have profited on the payments TEMI promised to make for the remaining years of the contract," which was "most certainly a claim for general damages" (*id.*).

Thus, under *American List* and *Tractebel*, profits a non-breaching party loses on third-party transactions are consequential rather than general damages even though "the ability of the non-breaching party to . . . generate profits on [these] collateral transactions, is contingent on the performance of the primary contract" (*Tractebel*, 487 F3d at 109). While not directly disavowing this general principle, the majority holds that because of the Agreement's method for determining the stent's purchase price, Biotronik's lost profits on prospective resales were moneys that Conor agreed to pay under the contract (*see* majority op at 808-809 ["Although the lost profits sought by (Biotronik) are not specifically identified in the agreement, it cannot be said that (Conor) did not agree to pay them under the contract, *as these profits flow directly from the pricing formula*" (emphasis added)]). Stated slightly differently, the majority holds that Biotronik's profits on resales under separate contracts with its customers are general rather than consequential damages because of contractual pricing provisions that potentially require Biotronik, the *non*-breaching party, to pay

moneys to Conor, the breaching party[4]—just the opposite of the situation in *American List* and *Tractebel*. I respectfully dissent.

## I.

Under the Agreement, Conor committed to supply, and Biotronik to purchase, a specified minimum quantity of the stents per calendar quarter. Biotronik agreed to pay Conor a negotiated purchase price per stent (the Minimum Transfer Price). The initial Minimum Transfer Price was not stated in the Agreement; going forward, however, the Agreement required the parties to stipulate the Minimum Transfer Price for the following calendar quarter no later than 30 days before the end of the current quarter.

The Agreement also called for Biotronik to provide Conor, within 20 days following the end of each calendar quarter, with a written report setting out, among other things, a figure calculated as a percentage of Biotronik's average sales price per stent (essentially, the gross amount invoiced by Biotronik to third parties, minus credits and expenses, divided by the number of the stents actually sold during the quarter), on a country-by-country basis, for the quarter in which the stents were shipped to Biotronik (the Transfer Price). In countries where Biotronik resold the stent directly to end users, the Transfer Price was 61% of this average sales price; in countries where Biotronik resold through sub-distributors, the Transfer Price was 75%. In the event the Transfer Price exceeded the Minimum Transfer Price Payment, Biotronik was obligated to pay Conor the difference as an upward "adjustment" to the purchase price initially stipulated per stent for that quarter (i.e., the Minimum Transfer Price).[5]

Thus, the Agreement did not direct Biotronik to resell any specific quantities of the stents it purchased from Conor; it

---

**4.** Conor contends that it did not breach the Agreement and on that score, the trial court found issues of fact preventing summary judgment in Conor's favor. For purposes of ease of discussion, I *assume* that Conor breached the parties' contract.

**5.** Section 5 of the Agreement, captioned "Prices, Price Adjustments, Volume Discount, Payment Terms," states at section 5.2 ("Price Adjustments") that "[p]rices shall adjust in accordance with the provisions of Exhibit C." The relevant provisions of Exhibit C, in turn, state as follows:

**"Pricing for [the stent]**

"I. Definitions:

"A 'Transfer Percent' shall have the appropriate meaning set forth below:

"1. In the case of [the stent]:

"a. For countries where BIOTRONIK sells directly: sixty-one percent (61%)

"b. For countries where BIOTRONIK sells indirectly: seventy-five percent (75%)

"B. 'Net Sales' shall mean the gross amount invoiced by BIOTRONIK . . . to third parties for sales of a [stent], less the following items, as allocable to such [stent] (if not previously deducted from the amount invoiced): (i) credits or allowances additionally granted upon returns, rejections or recalls; (ii) freight, shipping and insurance charges, provided such amounts are included in the gross amount invoiced above; and (iii) taxes, duties or other governmental tariffs (other than income taxes), provided such amounts are included in the gross amount invoiced above. For the purposes of this Exhibit C, Net Sales shall be calculated on a country-by-country . . . basis.

"II PRICING AND PAYMENT FOR PRODUCT

"A. Transfer Price. The transfer price (the 'Transfer Price') for each unit of each [stent] supplied by CONOR to BIOTRONIK hereunder and accepted by BIOTRONIK . . . shall be of the Transfer Percent of [the stent] times the average Net Sales per unit of [the stent] for the calendar quarter in which such [stent] is supplied to BIOTRONIK, which average shall be calculated by dividing the Net Sales of such [stent] for such calendar quarter by the number of units of such [stent] actually sold by BIOTRONIK during such calendar quarter and included in such Net Sales. No later than thirty (30) days prior to the end of each calendar quarter, the parties shall agree on a minimum transfer price per unit ('Minimum Transfer Price') for each [stent] for the following calendar quarter.

"B. Minimum Transfer Price Payment . . . BIOTRONIK shall pay to CONOR an amount equal to Minimum Transfer Price for such [stent] for the current calendar quarter multiplied by the number of units in such shipment (the 'Minimum Transfer Price Payment').

"C. Reconciliation

"1. Calculation of Transfer Price. Within twenty (20) days following the end of each calendar quarter, BIOTRONIK shall provide CONOR with a written report setting forth on a country-by-country . . . basis: (i) the Net Sales of [the stent] during such period; (ii) the number of units of [the stent] sold during such period; (iii) a calculation of the Transfer Price per unit of [the stent] for such period in accordance with Section II.A. of this Exhibit [C] . . .

"2. Transfer Price Exceeds Minimum Transfer Price Payment. If the Transfer Price for [the stent] for the for a [sic] given calendar quarter exceeds the Minimum Transfer Price Payment for such [stent] paid by BIOTRONIK for such calendar quarter, BIOTRONIK shall pay to CONOR the difference between such amounts.

surely did not dictate the prices at which Biotronik resold the stents under separate contracts with customers in the many markets in which it operated worldwide. The Agreement did not "*require*[ ] . . . Biotronik to resell [the stents] so that Conor could be paid," as asserted by Biotronik. Biotronik was obligated to pay Conor the Minimum Transfer Price stipulated for the stents shipped during a calendar quarter even if, hypothetically, Biotronik made no resales whatsoever in that quarter. Indeed, even if, again hypothetically, Biotronik's costs (in addition to what it initially paid Conor for the stents) were so high that it resold the stents at very little profit or at a loss, it would still owe Conor any difference between the Transfer Price and the Minimum Transfer Price Payment.

Notably, under no circumstance do the Agreement's pricing provisions require Conor (the breaching party) to pay any moneys to Biotronik (the non-breaching party); rather, under certain circumstances Biotronik (the non-breaching party) must pay additional moneys to Conor (the breaching party) for the purchase of the stents. As noted earlier, this situation is just the opposite of *American List*, where a provision in the parties' contract called for defendant U.S. News (the breaching party) to pay plaintiff American List (the non-breaching party) specified sums encompassing American List's future profits; or *Tractebel*, where defendant TEMI (the breaching party) was likewise obligated by a provision in the parties' contract to pay plaintiff AEP (the non-breaching party) specified sums encompassing AEP's future lost profits. Thus, because American List and AEP "sought only to recover moneys which" U.S. News and Tractebel, respectively, "undertook to pay under the contract" (*American List*, 75 NY2d at 43), we held that their future profits were general rather than consequential damages.

Here, the Agreement's pricing provisions merely established a mechanism for determining the purchase price that Biotronik paid Conor for the stents. Whatever profit Biotronik might make as a result of its efforts to resell the stents was contingent on the selling prices it negotiated with its customers, its sales volume and costs. True, one of those costs was the purchase price Biotronik paid Conor for individual stents, the product it sought to resell, but in no way does this signal that Biotronik's "profits flow[ed] directly from the [Agreement's] pricing formula" (majority op at 809).

---

"3. Timing. All payments due under this Section II.C. shall be made within thirty (30) days of CONOR's receipt from BIOTRONIK of the calculation report set forth in Section II.C.1."

## II.

In addition to *American List*, the majority discusses two other cases in some detail: *Compania Embotelladora Del Pacifico, S.A.* (CEPSA) *v Pepsi Cola Co.* (PepsiCo) (650 F Supp 2d 314 [SD NY 2009]) and *Orester v Dayton Rubber Mfg. Co.* (228 NY 134 [1920]). Turning first to *Compania Embotelladora*, in that case Judge Rakoff from the United States District Court for the Southern District of New York applied *Tractebel* to conclude that plaintiff CEPSA, a bottling company, did not seek money that defendant PepsiCo agreed to pay under the parties' exclusive bottler appointment agreement; rather, CEPSA asked for damages representing

> "lost profits from lost sales to third-parties that are not governed [by the parties' exclusive bottling agreement]. *Such damages are properly character-ized as consequential damages, because, as a result of PepsiCo's alleged breach, CEPSA suffered lost profits on collateral business arrangements* (*i.e.,* sales of PepsiCo products to its customers through-out its exclusive territory). *See Care Travel Co. v. Pan Am. World Airways,* 944 F.2d 983, 994 (2d Cir.1991) ('lost profits may be recovered' under an exclusive agency agreement only if 'it is "first [ ] demonstrated with certainty that such damages have been caused by the breach" ') (citation omit-ted); *[Champion] Spark Plug Co. v. Auto. Sundries Co.,* 273 F. 74, 83 (2d Cir.1921) (in the absence of an existing resale contract, lost profits on a manufac-turer's sales in its distributor's territory are conse-quential damages); *Evian Waters of France, Inc. v. Valley Juice Ltd., Inc.,* 90 Civ. 255, 1999 U.S. Dist. LEXIS 20542, at *10 (D.Conn. Sept. 30, 1999) (a claim of lost profits under an exclusive distributor-ship agreement must be demonstrated through 'competent evidence with reasonable certainty') (ap-plying New York law)" (*Compania Embotelladora,* 650 F Supp 2d at 322 [emphasis added]).

The majority interprets the foregoing quotation to mean that if CEPSA had "sought lost profits 'caused by the breach' [refer-ring to *Care Travel*], or under 'an existing resale contract' [referring to *Champion Spark Plug*], or under an 'exclusive distributorship agreement' [referring to *Evian Waters*], *the dam-ages would have been general, not consequential*" (majority op

at 808 [emphasis added]). This is not what these cases say. The damages issue in *Care Travel* was whether the plaintiff presented sufficient evidence to satisfy *Kenford*'s standard of proof for consequential damages, including that "such damages have been caused by the breach" (*see Care Travel*, 944 F2d at 994, quoting *Kenford*, 67 NY2d at 261; *see also supra* at 811 n 2). In *Champion Spark Plug* (273 F at 83), the court held that for lost profits from a resale contract to be recoverable, the resale contract must be in existence and known to the seller at the time of the original contract (*cf.* UCC 2-715 [2] [a]). And in *Evian Waters* (1999 US Dist LEXIS 20542 at \*10), the damages issue again was whether the plaintiff met *Kenford*'s evidentiary standards for recovery of consequential damages. Thus, these cases discuss whether consequential damages for lost profits were recoverable under the facts presented.

In *Orester*, the exclusive distributor of the "Dayton Pneumatic Tire" for the Syracuse area sued the manufacturer for its refusal to supply 1,000 tires he had ordered pursuant to the parties' contract. We faulted the trial judge for charging the jury to award damages on the basis of the difference between the price on the market in which the distributor *sold* the tires and the contract price, because this would allow him to recover his gross profits—i.e., what the distributor might have made if he sold the 1,000 tires at prices he himself had set. We then explained the hierarchy of tests for fixing damages for the manufacturer's failure to supply the tires, to instruct the judge on retrial.

First, "where the articles may be purchased in the market, the value of the contract to the purchaser is the difference between the price at which in like quantities [the articles] may be bought at the time and place of delivery, and the price which he would have had to pay under the contract" (*Orester*, 228 NY at 137). But here, where the purchaser could not buy the tires from others in the Syracuse area because "[h]e himself was the sole source of supply . . . If there was a market elsewhere at which tires in the quantity desired by the [purchaser] could be freely purchased[,] the damages would be the difference between the contract price and the price at that market plus the transportation charges to Syracuse" (*id.* at 137-138).

Next, "[i]n the absence of such a foreign market, if the [purchaser] might purchase a substitute tire, equally available for his reasonable purposes, then his damages would be the difference between the market price of such substitute and the

contract price" (*id.*). We added that "[w]hether another tire, even equally as good, but sold under another trade name, would be a satisfactory substitute to a dealer in Dayton tires may be at least doubtful[, but] is, however, a question of fact" (*id.*).

Finally, we concluded that *"if the other tests fail,"* the purchaser "may prove the ordinary and usual net profits resulting from business conducted in the ordinary and usual way, which he has lost by reason of such breach" (*id.* at 139 [emphasis added]). In short, loss of profits is the prescribed remedy—representing "the natural, the usual value of such a contract," not a "collateral engagement[ ] or consequential damage[ ]"—when there is no available remedy to otherwise measure damages (*id.* at 138).

New York adopted the Uniform Sales Act in 1911, nine years before we decided *Orester*. In the section of the law addressing a buyer's action for a seller's failure to deliver goods, the measure of damages was stated to be "the loss directly and naturally resulting in the ordinary course of events from" the breach (Personal Property Law former § 148 [2]),[6] essentially as stated in *Orester*. When there was "an available market for the goods in question," however, the measure of damages, "in the absence of special circumstances showing proximate damages of a greater amount,"[7] was the "difference between the contract price and the market or current price" (*id.* former § 148 [3]), again as stated in *Orester*.

In his usual, lucid prose style, then-Circuit Court Judge Harlan summed up pre-Uniform Commercial Code New York law on the subject of a buyer's damages for a seller's breach in a case called *Murarka v Bachrack Bros.* (215 F2d 547 [2d Cir 1954]). In *Murarka*, the New York seller breached a contract to sell 10,000 surplus military parachutes to the plaintiffs, a partnership doing business in Delhi, India, which had contracted to sell substantially all the parachutes to four Indian concerns. When the seller breached the contract (it found another buyer willing to pay more), the plaintiffs "made continuing efforts to purchase similar parachutes but were unsuccessful because none were available on the American market" (*id.* at 554).

Judge Harlan, twice citing *Orester*, wrote that

> "[i]n an action for failure to deliver goods the New York rules are these: If there is an available market

---

**6.** Section 148 is the same as section 67 of the Uniform Sales Act.

**7.** In *Orester*, we specifically noted that we "decide[d] nothing as to special damages which must be alleged in the complaint" (228 NY at 139).

for the goods in question, the measure of damages is the difference between the contract price and the market price, unless there are 'special circumstances showing proximate damages of a greater amount' (the so-called 'special damage' rule). N.Y. Personal Property Law, McK. Consol. Laws, c. 41, Sec. 148(3) . . .

"But where, as here, there is no available market for the goods in question, the measure of damages 'is the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract', N.Y. Personal Property Law, Sec. 148(2); and it is well settled that such loss may be measured by the net profits, if not speculative, which the buyer would have earned had the seller performed. . . .

"Here the plaintiffs' loss of profits constituted general damages recoverable under Sec. 148(2) because there was no available market" (*Murarka*, 215 F2d at 554-555 [citations omitted]).

As pointed out in Corbin on Contracts, however, "[t]he analysis today, under the Uniform Commercial Code, would be somewhat different" (11-56 Corbin on Contracts § 56.10). Specifically,

"[t]he buyer's general damages would be measured by the difference between the market price (or the cover price[8]) and the contract price. *Because there was no available market, the plaintiff's damages would be classified as 'consequential.'* Under UCC § 2-715 (2), plaintiff would be allowed to recover such consequential damages if they represented a 'loss resulting from the general or particular requirements and needs of which the seller at the time of contracting had *reason to know* and which could not reasonably be prevented by cover or otherwise' " (*id.* [emphases added]).

---

**8.** A buyer may "cover" by buying or contracting to buy substitute goods in the event of the seller's nondelivery (*see* UCC 2-712; *see also* 2-713 [Buyer's Damages for Non-Delivery or Repudiation], 2-723 [Proof of Market Price: Time and Place]).

And, it might be added that, as relevant to this case, "[i]n the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know within the meaning of subsection (2)(a)" (UCC 2-715, Comment 6).

Biotronik touts *Orester* as "the only applicable New York case," which controls the outcome here because we "flatly held [in *Orester*] that . . . lost profits under a distribution agreement are direct rather than consequential damages."[9] The majority seems generally to agree, and lets Biotronik slip the noose of the Agreement's limitation-of-liability provision. But Biotronik (and the majority) simply ignore the entirety of the decision: What *Orester actually* holds is that a buyer's lost profits are the prescribed remedy for a seller's breach *when there is no available market by which to otherwise measure damages*, a principle that the Uniform Commercial Code enshrines in section 2-715 (2) (a), governing *consequential* damages from a seller's breach. Thus, while *Orester*'s holding as to the *measure* or *availability* of lost profits may still be applicable, modern law now locates these principles firmly under the rubric of consequential damages.

The record clearly shows there were at least three other brands of drug-eluting coronary stents commercially available when Conor breached the Agreement. Additionally, the Agreement itself presupposes the availability of substitute products; specifically, the provision entitled "Assurance of Supply" states that, in the event Conor decides to discontinue manufacture, "[w]here possible, the Parties shall agree on a replacement of such discontinued Product and the time schedule of the transition from the discontinued Product to a suitable replacement product," but "[i]f no such replacement product is agreed, [Biotronik] shall have the right to terminate the Agreement on 30 (thirty) days written notice to [Conor]." Here, discussions between the parties for Conor to supply Biotronik a substitute drug-eluting coronary stent broke down. But this should not relieve Biotronik, if it intends to rely on *Orester* to recover lost profits, of the obligation imposed by that case to show first that a good faith but ultimately unavailing effort was made in the

---

**9.** *Orester* is sufficiently obscure that Biotronik apparently never mentioned it at Supreme Court, and certainly did not cite the case in its briefs submitted to the Appellate Division. Before today, we last mentioned or cited *Orester* in 1951 (*see Spitz v Lesser*, 302 NY 490 [1951] [defendant manufacturer's breach of contract entitled plaintiff inventor to the minimum royalties due under the contract as the agreed measure of damages]).

marketplace to secure a substitute for the stent. And that, in turn, presupposes that such lost profits could be categorized as general damages in this case, which *American List, Tractebel*, and the Uniform Commercial Code show they cannot.

### III.

The Agreement is a complicated one, entered into by sophisticated and counseled commercial parties. Biotronik and Conor made detailed arrangements for the conditions under which either could terminate the contract before the term expired. They paid particular attention to eventualities and risks inherent in the manufacture and sale of a medical device. Thus, the Agreement addresses material changes to the product, and, of course, discontinuance of manufacturing and product recalls.

The parties also agreed to a limitation-of-liability provision. Biotronik now argues that if this provision were intended to prevent its recovery of lost profits, it would be left with *no* remedy if Conor simply walked away from its supply obligation, and this cannot be so. There are two answers. First, Biotronik would only be remediless if there were, in fact, no available market replacement for the stent. By virtue of the agreed-upon limitation of liability, Biotronik would be foreclosed, in this situation, from recovery of consequential damages under Uniform Commercial Code § 2-715 (2) (a).

Second, we have held, and it is acknowledged as a general principle of contract law, that an intentional breach is worthy of no more damages than an inadvertent one (*see Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430, 435 [1994] ["Generally in the law of contract damages, as contrasted with damages in tort, whether the breaching party deliberately rather than inadvertently failed to perform contractual obligations should not affect the measure of damages"]; *see also Globe Refining Co. v Landa Cotton Oil Co.*, 190 US 540, 544 [1903, Holmes, J.] ["If a contract is broken, the measure of damages generally is the same, whatever the cause of the breach"]; Glen Banks, New York Contract Law § 1:12 at 15-16; Charles Knapp, Commercial Damages: A Guide to Remedies in Business Litigation § 1.2 [4] at 1-6). In that vein, if contracting parties agree to a limitation-of-liability provision, it will be enforced unless unconscionable, even if it leaves a non-breaching party without a remedy (*see Metropolitan Life*, 84 NY2d at 436).

From Conor's perspective, it bargained to preclude any liability under the Agreement for consequential damages. And

while lost profits are sometimes general damages, post-Uniform Commercial Code cases delineating the dividing line between general and consequential damages as a matter of New York law place Biotronik's lost resale profits squarely on the consequential damages side of the boundary. These damages flow from collateral transactions—Biotronik's contracts with its resale customers—rather than from any provision of the Agreement requiring the breaching party to make a payment to the non-breaching party, as was the case in *American List* and *Tractebel*.

But Biotronik has devised, and the majority has accepted, a way to circumvent the natural meaning of the limitation-of-liability provision, combining a novel reading of the provisions governing how much Biotronik agreed to pay Conor to purchase the stents with certain aspects of *Orester*, a 94-year-old decision whose central holding was long ago absorbed into the Uniform Commercial Code in section 2-715 (a) (2), dealing with consequential (not general) damages. Creativity on this scale is no boon in the commercial world, "where reliance, definiteness and predictability are such important goals of the law itself, designed so that parties may intelligently negotiate and order their rights and duties" (*Matter of Southeast Banking Corp.*, 93 NY2d 178, 184 [1999]).

Chief Judge Lippman and Judges Graffeo and Smith concur with Judge Rivera; Judge Read dissents in an opinion in which Judges Pigott and Abdus-Salaam concur.

Order reversed, with costs, case remitted to the Appellate Division, First Department for further proceedings in accordance with the opinion herein, and certified question not answered upon the ground that it is unnecessary.